# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-2109 CAS |
| | ) | |
| FRANCIS G. SLAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

These three cases alleging federal civil rights violations under 42 U.S.C. § 1983, consolidated for pretrial purposes, are before the Court on defendants' motions in limine to exclude the testimony of plaintiffs' expert witness, Dr. Angela Wingo, Ph.D. Defendants argue that Dr. Wingo's expert report and testimony do not meet the standards for admissibility set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Plaintiffs oppose the motions and they are fully briefed. Oral argument was held on June 5, 2014, but no party requested an evidentiary hearing. The parties have submitted an extensive evidentiary record in connection with the motions, which includes Dr. Wingo's expert report and deposition. For the following reasons, the defendants' motions will be granted in part and denied in part.

## Background

These actions were filed by the plaintiffs against the members of the Board of Police Commissioners of the St. Louis Metropolitan Police Department ("Board"), and three of its former police officers, defendants Carr, Sharp and Garrett (collectively referred to as the "individual defendants"). Each plaintiff alleges that his federal civil rights were violated when he was arrested, convicted and imprisoned for a period of years based on false evidence manufactured by defendants

Carr, Sharp and/or Garrett.  Plaintiffs also allege that the Board had a policy, or a pervasive custom and practice, of reliance on manufactured evidence, and that it failed to train, supervise, control, instruct or discipline the officers under its control in various respects.

During the plaintiffs' incarceration, the Federal Bureau of Investigation and the United States Attorney's Office for the Eastern District of Missouri began to investigate Carr, Sharp and Garrett for illegal activities.  Defendants Carr and Garrett pleaded guilty to multiple federal criminal charges and were sentenced to terms of imprisonment.  See United States v. Garrett, Carr and Liston, Case No. 4:08-CR-703 ERW (E.D. Mo.).  Plaintiffs allege that the investigation also led to defendant Sharp leaving the police department in June 2009 "under charges" of fraudulently concocting affidavits in support of search warrants.

Following public disclosures concerning Carr, Sharp and Garrett's conduct, each plaintiff sought habeas corpus relief under 28 U.S.C. § 2255, and their criminal sentences were vacated. Plaintiff Jones was issued a Certificate of Innocence pursuant to 28 U.S.C. § 2513 by the Honorable Carol E. Jackson on May 12, 2011.  Plaintiff Holmes' motion for a Certificate of Innocence remains pending before Judge Jackson.

In addition to federal civil rights claims against Carr, Sharp and/or Garrett and the Board pursuant to 42 U.S.C. § 1983, the plaintiffs also assert supplemental state law claims for malicious prosecution, wrongful imprisonment and abuse of process.

**Legal Standard**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702.  The Eighth Circuit has explained that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir.

1999), and "favors admissibility if the testimony will assist the trier of fact." Clark ex rel. Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93.

The Eighth Circuit Court of Appeals has stated that proposed expert testimony must meet three criteria to be admissible under Rule 702. "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). "Second, the proposed witness must be qualified to assist the finder of fact." Id. (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." Id. To meet the third requirement, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods;" and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d).

As a general rule, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for

the opinion in cross-examination." Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 416 (8th Cir. 2005) (quoted case omitted). However, "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." Lawrey v. Good Samaritan Hosp., __ F.3d __ , 2014 WL 2489076, at *5 (8th Cir. June 4, 2014) (quoting Nebraska Plastics, id.). An expert opinion is fundamentally unsupported when it "fails to consider the relevant facts of the case." Nebraska Plastics, 408 F.3d at 416.

**Discussion**

Dr. Wingo received a Ph.D. in Educational Psychology in 1997. She also has a Masters of Science degree in Rehabilitation Counseling and a Bachelor of Arts degree in Psychology. Since 2010, she has been the Dean of Students at Lindenwood University-Belleville (Illinois). Her duties include serving as the director of campus security and overseeing the campus police force. As Director of Security, Dr. Wingo deals with daily operations of the police patrol and is charged with writing and enforcing policies and procedures for the Department of Security.

Dr. Wingo is also the Executive Vice President of Public Safety Specialist's Group, Inc. ("PSSG"), a company she co-founded in 1995. Her duties at PSSG include law enforcement training, departmental analysis, consultation, employment assessments, education and development, policy revisions, construction and audits. Dr. Wingo is also a certified assessor for the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA"), an independent, nonprofit law enforcement credentialing authority that seeks to "improve the delivery of public safety services, primarily by: maintaining a body of standards, developed by public safety practitioners, covering a wide range of up-to-date public safety initiatives; establishing and administering an accreditation

process; and recognizing professional excellence."[1]  She has consulted with a number of police departments to assist them in obtaining CALEA accreditation, including the Washington, D.C. Metropolitan Police Department and the Collinsville, Illinois Police Department, and has consulted with approximately forty police and fire departments on hiring and promotional processes, policy construction and implementation including reviewing and updating policy manuals, training, job task analysis, and critical incident processes.  She has given many training presentations to police departments on, among other things, ethical issues for law enforcement personnel.

Dr. Wingo's revised report[2] contains an "Opinion and Summary" section that states:

Detectives Sharp, Carr, and Garrett's actions against the three plaintiffs were unconstitutional, an egregious abuse of authority, exhibited conduct unbecoming of an officer and the profession, and were carried out due to a failed atmosphere of supervision and endorsed corruption.  Additionally, the St. Louis Metropolitan Police Department failed in ensuring the proper protocol was followed in regard to several of their Policies and Special Orders in operation at the time of each incident. Inconsistent and inappropriate behaviors were chronicled that violated the following orders:

- 86-S-19 Processing of Complaint Referrals from Mayor's Office Citizens Bureau
- 89-S-9 Photos of Merchandise to be Evidence in Prosecution
- 90-S-12 Evidence and Property Control Procedures
- 91-S-13 Bureau of Administration/Internal Affairs Division
- 93-S-10 Procedures for Forwarding Police Reports
- 93-S-12 Procedures for the Police Incident Reporting System
- 94-S-4 Bureau of Investigation Procedures
- 97-S-2 Investigation of Drug Related Calls Received via Hotline

Policies are meant to be the guideposts of appropriate, just, and correct behavior of each officer in the department.  Failure to uphold, support, train, follow, adhere to,

---

[1]      See CALEA, "About Us; The Commission," http://www.calea.org/content/commission (last visited June 19, 2014).

[2]      Dr. Wingo's revised report bears the date of her original expert report, January 19, 2014, but was produced to the defendants during her deposition on April 3, 2014.

and enforce compliance with departmental policies, leaves Administration culpable for errant behaviors from subordinates. Having a policy manual in place that is randomly enforced, leaves the departmental climate ripe for corruption, illegal, and unconstitutional behaviors.

Had the appropriate steps been followed in supervising these officers, conducting proper and comprehensive Internal Investigations following serious and congruent complaints, issuing discipline in accordance with policy for various infractions that were sustained, it is highly probable neither Plaintiff Jones, Plaintiff Holmes, or Plaintiff Cox would have been subjected to the gross miscarriage of justice that resulted in each being wrongfully convicted, imprisoned, and denied their Constitutional liberties.

Given the complaint history to the Department Administration, the Department is further responsible for having an administration overseeing the Police Department who behaved irresponsibly, and with dereliction of duty by minimizing and negating complaints brought forward regarding Detectives Sharp, Carr, and Garrett's failed performances and illegal practices, rather than following current Internal Affairs policy on Complaints and Discipline. Additional policies were violated by all three officers, which is ultimately the City of St. Louis' responsibility to ensure proper practices are being followed within their police department.

Finally, the City of St. Louis failed to supervise, control, discipline, assess, and/or investigate Sharp, Carr, and Garrett, along with other implicated personnel employed by the police department. The actions outlined in this case, based on my education, experience, and expertise, were undoubtedly avoidable. There were numerous indicators throughout the careers of each officer, which provided a clear roadmap of unethical, unscrupulous, and derelict behavior. The Departmental Policies were in place to prevent the unjust arrests of each plaintiff, however, there was an inherent culture of burying complaints and avoiding disciplining officers. A review of IAD Charges and Disposition Records for the years of 1991-1997 shows uncharacteristically low reporting of violations for a department this size, with a minuscule number actually being founded or Sustained resulting in discipline.

The illegal behaviors of Detectives Sharp, Carr, and Garrett were bred in a department where misbehavior and inappropriateness became the cultural norm. The Department Administration all but endorsed bad behavior through the minimization of lessor offenses previously reported as complaints on each officer. Further, the Department Administration failed to recognize these problem officers, with the number of disciplines and complaints received during their tenure with the department.
Finally, the responsibility is shared amongst the City of St. Louis, the St. Louis Metropolitan Police Department and its' law enforcement agents. The culture and common practices of falsifying affidavits, planting and manufacturing evidence,

lying on reports and in court testimony, theft of confiscated property, and destruction of evidence was endorsed and promoted through a lack of oversight and failure to discipline. By passively endorsing inappropriate behaviors through the failure to discipline, the Plaintiffs have been severely and significantly damaged universally in this case.

Angela Wingo expert report at 21-23 (Ex. 2 to Pls.' Mem. Opp. Motion to Exclude Testimony) (Doc. 168).

The defendants move to exclude Dr. Wingo's expert report and testimony on the following grounds: (1) Dr. Wingo is not qualified to offer an opinion in the areas of police policy and procedure, misconduct, discipline or internal affairs; (2) Dr. Wingo's testimony should be excluded because her report was produced late and she was produced for deposition late under the Case Management Order's ("CMO") deadlines; (3) Dr. Wingo's testimony and report as to each police officer defendant is inadmissible because it is based solely on the plaintiffs' allegations; (4) Dr. Wingo's testimony is not reliable; (5) Dr. Wingo's testimony would not be helpful to the jury and intrudes upon the province of the jury and the Court, and (6) Dr. Wingo's report and testimony amount to legal conclusions. The Court will address each of defendants' argument in turn.

1. Dr. Wingo's Qualifications

Rule 702 of the Federal Rules of Evidence states that an expert may be qualified by "knowledge, skill, expertise, training, or educational" Whether a witness is qualified as an expert depends on whether the witness' training and experience demonstrate knowledge of the subject matter. Moran v. Ford Motor Co., 476 F.2d 289 (8th Cir. 1973). For an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion. Schmidt v. City of Bella Villa, 557 F.3d 564 (8th Cir. 2009).

The Court finds that Dr. Wingo's years of experience in consulting with numerous police departments in connection with CALEA certification and departmental policy matters, and her experience in offering training presentations to police concerning ethical issues among other topics, adequately qualifies her to offer opinions in this matter. This aspect of the defendants' motions to exclude Dr. Wingo's testimony should therefore be denied.

2. <u>Timeliness and Further Amendment</u>

It is uncontroverted that Dr. Wingo's draft report was provided eight days after the CMO deadline, she was not made available for deposition until April 3, 2014 although the CMO deadline was January 30, 2014, and her revised report was not provided to the defendants until her deposition had already begun. Defendants argue that Dr. Wingo's testimony should be stricken in its entirety based on these violations of the CMO. Plaintiffs ask that Dr. Wingo be permitted to further amend her report to correct errors contained therein.

Upon a finding that a party's Rule 26 expert disclosure was inadequate, a court must determine the appropriate sanction, if any. Under Rule 37(c)(1), Fed. R. Civ. P., a range of potential punishments exist for failure to comply with a rule. The choice of the sanction or remedy lies within the wide discretion of the trial court, <u>Wegener v. Johnson</u>, 527 F.3d 687, 692 (8th Cir. 2008), and the Rule requires the court to consider whether the party's failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).

The Eight Circuit has identified several factors for district courts to consider before excluding evidence: the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony. <u>See</u> <u>Wegener</u>, 527 F.3d at 692 (citing

cases). The complete exclusion of evidence "is a harsh penalty and should be used sparingly." <u>Id.</u> (quoted case omitted).

The plaintiffs state that the delay in producing Dr. Wingo's report and taking her deposition arose "due to ongoing disputes and delays" involving the defendants' production of documents, as well as the parties' busy schedules and an illness suffered by Dr. Wingo. Any prejudice resulting to the defendants appears to be minimal, and the Court notes that neither side sought Court intervention or relief with respect to expert discovery matters. Although the defendants were surprised when they were provided with a revised expert report during Dr. Wingo's deposition, they did not seek a continuance and instead proceeded with the deposition and were able to question Dr. Wingo at length. The Court does not find that permitting Dr. Wingo's testimony would disrupt the order or efficiency of the trial. Further, Dr. Wingo's testimony is important to plaintiffs' case against the Board, in particular. Under these circumstances, the Court finds that the delay in producing plaintiffs' expert is harmless and Dr. Wingo's testimony should not be excluded based on plaintiffs' failure to comply with the CMO deadlines regarding expert witnesses. This aspect of the defendants' motions to exclude Dr. Wingo's testimony should therefore be denied.

The Court will not permit Dr. Wingo to further amend or supplement her expert report at this late date, however. Such amendment or supplementation would necessarily prejudice the defendants, as it would require that Dr. Wingo be redeposed, and the defendants have filed summary judgment motions and the first trial, in <u>Holmes v. Slay, et al</u>, No. 4:12-CV-2333 HEA, is scheduled to commence on September 2, 2014.

3. <u>Dr. Wingo's Testimony is Based on Acceptance of Plaintiffs' Versions of the Facts</u>

The defendants assert that in forming her opinions, Dr. Wingo only reviewed each plaintiff's Complaint, accepted all the facts alleged as true, and opined on this basis that the individual defendants' actions "were unconstitutional, an egregious abuse of authority, [and] exhibited conduct unbecoming of an officer and the profession." Wingo expert report at 21. With respect to the Board, Dr. Wingo opined that it failed to "uphold, support, train, follow, adhere to, and enforce compliance with" multiple SLMPD policies and special orders which she claims were violated by the individual defendants, id., and that it acted with "dereliction of duty by minimizing and negating complaints brought forward" regarding the individual defendants. Id. at 22.

The defendants contend that because Dr. Wingo's opinions are based on her assumption that the Complaints' allegations are true, they are nothing more than opinions that the plaintiffs are telling the truth. Defendants assert that expert opinions based rely only on the allegations of the plaintiff and which seek to bolster the credibility of the plaintiff are not admissible.

The plaintiffs respond that Dr. Wingo testified she reviewed thousands of pages of documents produced by the Board, as well as the depositions taken to date, in forming her opinions. Plaintiffs state that contrary to defendants' contention, Dr. Wingo testified that she reviewed and relied on the record evidence, such as the police reports and the depositions of each of the individual plaintiffs in addition to the Complaints. Plaintiffs assert that Dr. Wingo's report and testimony discuss in detail the policies and procedures of the St. Louis Metropolitan Police Department ("SLMPD"), and rely on other citizen complaints made against the individual officers, as well as complaints against other officers. Plaintiffs also assert that at her deposition, Dr. Wingo reaffirmed based on the documents and testimony she had reviewed that there were ongoing problems with

widespread misconduct in the SLMPD and notice to the SLMPD of these problems, but that the Board failed to properly train, supervise and discipline its officers.

"It is the exclusive province of the jury to determine the believability of the witness. United States v. St. Pierre, 812 F.2d 417, 419 (8th Cir. 1987). An expert is not permitted to offer an opinion as to the believability or truthfulness of a victim's story." Bachman v. Leapley, 953 F.2d 440, 441 (8th Cir. 1992). "Weighing evidence and determining credibility are tasks exclusive to the jury, and an expert should not offer an opinion about the truthfulness of witness testimony." Nichols v. American Nat'l Ins. Co., 154 F.3d 875, 883 (8th Cir. 1998).

Dr. Wingo's report as quoted above and her deposition testimony include multiple instances where she states as her expert opinion that the plaintiffs are telling the truth, that disputed facts alleged in the plaintiffs' Complaints are true and happened as alleged, that statements in police reports are false, and that the individual defendants' testimony at plaintiffs' trials was entirely false. These are impermissible opinions that vouch for the plaintiffs' credibility and invade the province of the jury, and the defendants' motions to exclude them should be granted.[3] There are, however, exceptions to this exclusion concerning Dr. Wingo's opinions as to the truthfulness of the plaintiffs' allegations, as follows.

As to plaintiff Jones, Dr. Wingo may testify and may base her opinions on the fact that Jones was actually innocent of the charge of possession of cocaine base with the intent to distribute set forth in the indictment in United States v. Stephen Jones, Case No. 4:98-CR-12 CEJ (E.D. Mo.), because Jones was granted a certificate of innocence pursuant to 28 U.S.C. § 2513. To obtain the

---

[3]    Dr. Wingo's report and testimony also include impermissible legal conclusions, which will be discussed later.

certificate of innocence, Jones had to prove that (1) his conviction was set aside on the ground that he was not guilty; (2) he was actually innocent of the offense of which he was convicted; and (3) he neither caused nor brought about his own prosecution. See Jones v. United States, No. 4:10-CV-1748 CEJ (E.D. Mo.), Mem. and Order of June 23, 2011 at 2-5 (Doc. 16). Dr. Wingo may also base her opinions regarding plaintiff Jones on the fact that the United States represented to the Court that the testimony of defendants Carr and Sharp against Jones could not be corroborated by independent credible evidence, and lacked credibility. Id. at 3. Dr. Wingo may not, however, testify that either Carr or Sharp's trial testimony was actually false.

As to plaintiff Holmes, Dr. Wingo may testify and may base her opinions on the facts that (1) in plaintiff Holmes' 2005 criminal case, defendant Sharp was the only witness who testified to Holmes' alleged guilt, and defendant Garrett was the only witness who testified that Holmes admitted to drug trafficking during a 1995 arrest; (2) Sharp and Garrett were "discredited" as witnesses; and (3) the evidence of Holmes' guilt, apart from Sharp and Garrett's testimony, "would have been insufficient to establish [that he was] guilty beyond a reasonable doubt." See Holmes v. United States, 4:08-CV-1142 CEJ (E.D. Mo.), Mem. and Order of Sept. 26, 2011 at 8, 10 (Doc. 39). Dr. Wingo may not testify, however, that either Sharp or Garrett's trial testimony was actually false, or that Holmes was actually innocent of the charges against him.[4]

With respect to plaintiff Cox, Dr. Wingo may testify and may base her opinions on the facts that the United States represented to the Court that (1) "false statements and omissions may have been made with reckless disregard for the truth by [defendant Garrett] the sole Affiant to the . . .

---

[4] This prohibition includes testimony that, for example, plaintiff Holmes did "at no time have or throw down a brown bag containing cocaine nor was he ever in possession of the weapons, drugs or other paraphernalia admitted into evidence . . . ." (Wingo expert report at 10.)

search warrant," (2) the United States "would be unable to offer relevant credible evidence in defense of the affidavit in support of the search warrant," and (3) "there is no longer legal reason or sufficient lawful evidence to pursue" Cox's prosecution for possession with intent to distribute more than 50 grams of cocaine base as charged in Count I, or for possession of a firearm in violation of 18 U.S.C. § 924(g) as charged in Count IV of the indictment against him in <u>United States v. Cox</u>, 4:97-CR-274 CEJ (E.D. Mo.). <u>See Cox v. United States</u>, No. 4:10-CV-1572 CEJ (E.D. Mo.), Stipulation by the Parties at 3, ¶¶ 9-11 (Doc. 9). Dr. Wingo may not, however, testify that defendant Garrett actually submitted a false affidavit, or that plaintiff Cox was actually innocent of the charges against him.

The Court notes that defendants have not cited any cases which hold that an expert may not, under any circumstances, assume the facts as alleged by a plaintiff are true in formulating opinions, as opposed to improperly testifying as an opinion that the facts alleged by a plaintiff are true. Defendants rely on <u>United States v. Whitted</u>, 11 F.3d 782, 786 (8th Cir. 1993), a child sex abuse case in which the Eighth Circuit held that a medical expert could not base his opinion solely on the alleged victim's allegations of abuse. <u>Whitted</u> is distinguishable from the instant case, because here Dr. Wingo's opinions are not based only on the plaintiffs' allegations, but also on other evidence including SLMPD records and deposition testimony, as well as her knowledge of prevailing standards of police behavior and policies.

To the extent defendants challenge Dr. Wingo's opinions that the Board had notice of problems with the individual defendants and other officers but failed to take corrective action, and that the SLMPD did not follow established procedure in conducting internal investigations, these opinions are not so fundamentally unsupported that they can offer no assistance to the jury. These

opinions are based in part on Dr. Wingo's review of the one-page "face sheets" reflecting the results of Internal Affairs Division ("IAD") investigations; her review of similar citizen complaints, including unsustained complaints; information concerning ongoing training (or lack thereof) as reflected in the individual defendants' personnel files; and statistical data concerning the overall number of citizen complaints submitted; as well as her knowledge of prevailing police department standards and policies.[5]

Dr. Wingo may not, however, opine that the Board failed to train or supervise the individual defendants because such an opinion would both invade the province of the jury and constitute an impermissible legal conclusion. It will be necessary for plaintiffs' counsel to use great care in formulating his questions to Dr. Wingo so as to avoid eliciting opinions that tell the jury what to find or consists of a legal conclusion.

4. Dr. Wingo's testimony is not reliable

The defendants also move to exclude Dr. Wingo's testimony as unreliable, arguing it is so fundamentally unsupported by the facts it cannot offer any assistance to the jury, and also that it is based on unreliable methods.

Defendants state that although Dr. Wingo testified she had reviewed all the documents and testimony in the case prior to her deposition, she proved to have a weak grasp on the facts. For example, Dr. Wingo did not know the charges to which defendant Carr pleaded guilty; she erroneously believed defendant Sharp had pleaded guilty to criminal charges; and she conflated the

---

[5] Defendants' argument that the one-page IAD face sheets are insufficient to show the evidence actually presented to the IAD and its decisionmaking with respect to each citizen complaint, goes to the factual basis of Dr. Wingo's expert opinion and therefore concerns its credibility rather than admissibility. Defendants' remedy is to examine the factual basis for Dr. Wingo's opinions on cross-examination.

identities of defendants Carr and Sharp on numerous occasions, lumping the defendants together and confusing the allegations and charges against each of them. Dr. Wingo also stated that with respect to defendants Sharp and Carr, wrongdoing by one officer could be attributed to the other because they worked together as partners. Dr. Wingo's report concluded that defendant Carr had included false information in the affidavit in support of the warrant obtained to search the residence where plaintiff Jones was arrested, but admitted in her deposition that she had not seen the affidavit in question and was speculating that it was false. Also, while Dr. Wingo's report stated that it was "fair to suppose" defendants Carr and Sharp suppressed relevant photographs at Jones' 1998 criminal trial, she admitted in her deposition that evidence is sometimes innocently misplaced, and she could not tell what had happened in this case.

Defendants state that when Dr. Wingo was pressed at deposition to identify specific facts to support her opinions, she explained vaguely that her opinions were based on the "totality of all of the documents," and that "[f]rom [her] vantage point, there's a lot of moving parts that come together into a cohesive unit." Elsewhere she testified that her opinion was based on the "totality of the other information, all of the other information," "taking in the totality of the evidence or of the documents that were provided to me, I believed that what they were saying was true," and "I was using the totality of the information, just looking at the different reports."

Defendants also contend Dr. Wingo's testimony is not the product of reliable methods, citing her deposition testimony that as a psychologist and occasional ethics instructor, she believes "past behavior oftentimes and more than likely predicts future behavior." Defendants state that although Dr. Wingo conceded there were many facts she did not have information on, she claimed that her

Ph.D. in Psychology allowed her to "deduce" and "assume," and to "look at facts that are presented . . . and determine that there is a pattern that exists."

The Court finds that this aspect of defendants' motion to exclude Dr. Wingo's testimony raises serious questions about the factual basis of her opinions. Dr. Wingo was obviously unprepared for her deposition, as her testimony confused a number of the underlying facts in the case. After careful consideration, the Court will not exclude Dr. Wingo's testimony in its entirety because of these factual errors, as her opinions are not completely unsupported by the record, and defendants may delve into any testimonial errors at trial on cross examination.

Dr. Wingo may not, however, testify that her opinions are based on the totality of the information or evidence, and must identify the specific evidentiary basis for any opinions. Dr. Wingo also may not testify that acts of wrongdoing by an individual defendant can be attributed to another individual defendant.

Further, although Dr. Wingo may testify generally to inform the jury about psychological terms and concepts, such as "ethical theory" and "ethical continuum," she may not opine that the individual defendants' past actions were predictors of their future actions, that the Board of SLMPD's action or inaction created an equitable continuum, or give opinions based on assumptions or deductions informed by her psychological training. See Nichols, 154 F.3d at 883 (psychiatrist's testimony went beyond explaining psychiatric terms and situations when she testified that the plaintiff's statements to another psychiatrist were influenced by recall bias, secondary gain and malingering; this testimony invaded the province of the jury by instructing it how to weigh that evidence); Westcott v. Crinklaw, 68 F.3d 1073, 1077 (8th Cir. 1995) (doctor's testimony that police officer who shot suspect was suffering from post-traumatic stress syndrome following the shooting,

and that this syndrome may cause a person to make incomplete, inaccurate and misleading statements, was improperly admitted because it directly addressed the defendant's credibility); cf. United States v. Rouse, 111 F.3d 561, 570-71 (8th Cir. 1997) (psychologist could describe "practices of 'suggestibility'" in questioning child witnesses that produce unreliable testimony, but did not testify these practices were actually employed on the child witnesses in the case); Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir. 1991) (psychologist permitted to describe battered woman syndrome but not to give opinion on whether the victim suffered from it or displayed symptoms of it).

5.   Dr. Wingo's testimony intrudes upon the province of the jury

The defendants argue that Dr. Wingo's opinions tell the jury what result to reach because they purport to resolve all of the key factual disputes in the cases, and are therefore inadmissible because they intrude on the jury's role as factfinder and create a serious danger of confusing or misleading the jury into substituting the expert's credibility assessment for the jury's own assessment. Defendants point to Dr. Wingo's opinions as to "what happened" in the cases, including that the plaintiffs did not possess any drugs when they were arrested, that the plaintiffs' Complaints are "sound" and all the facts alleged therein are true, and that the individual defendants, among other things, gave false testimony at plaintiffs' trials.   The Board also seeks to exclude Dr. Wingo's opinion that it acted with "dereliction of duty by minimizing and negating complaints brought forward regarding Defendants Garrett, Sharp and Carr."

Under the Federal Rules of Evidence, opinion testimony is not inadmissible solely because it embraces an ultimate issue to be decided by the trier of fact.  Fed. R. Evid. 704(a).  This does not mean that all opinion testimony as to ultimate issues is admissible.  In the case of an expert witness,

the opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Opinions that "merely tell the jury what result to reach" are not admissible because they are not sufficiently helpful to the trier of fact. See, e.g., Lee v. Anderson, 616 F.3d 803, 809 (8th Cir. 2010) (expert's opinion that photograph showed plaintiff did not have a gun in his hand was properly excluded, as it would not have assisted the jury but rather would have told it what result to reach). Further, as previously stated, "Weighing evidence and determining credibility are tasks exclusive to the jury, and an expert should not offer an opinion about the truthfulness of witness testimony." Nichols, 154 F.3d at 883.

Here, the Court has determined that Dr. Wingo cannot testify as to "what happened" in the case, that the plaintiffs' version of the facts are true (except as expressly set forth above at pages 11-13), or that the individual defendants' testimony in plaintiffs' criminal trials was false. This aspect of defendants' motions in limine should therefore be granted.

The Court will also exclude Dr. Wingo's opinion that the Board acted with "dereliction of duty by minimizing and negating complaints" made about the individual defendants, as it would not be sufficiently helpful to the jury. Dr. Wingo may testify, however, about prevailing standards and policies in the field of law enforcement with respect to the handling of citizen complaints, citizen complaints made about the individual defendants and other police officers, and the SLMPD's response to those complaints.

6. Dr. Wingo's report and testimony amount to legal conclusions

Finally, the individual defendants move to exclude Dr. Wingo's opinions and testimony that their actions "were unconstitutional, an egregious abuse of authority, [and] exhibited conduct

unbecoming of an officer and the profession," arguing that these are legal conclusions and not appropriately considered an expert opinion. The defendants are correct.

"Legal conclusions do not qualify as expert opinions." Estes v. Moore, 993 F.2d 161, 163-64 (8th Cir. 1993). A determination that a defendant's conduct constitutes a constitutional violation is a legal conclusion. Wade v. Haynes, 663 F.2d 778, 784 (8th Cir. 1981). Therefore, Dr. Wingo may not opine that any of the defendants' conduct violated a constitutional right or norm. See Schmidt v. City of Bella Villa, 557 F.3d 564 (8th Cir. 2009) (proposed police policy expert properly excluded because his opinions were improper legal conclusions regarding whether conduct purported to Fourth Amendment standards); see also Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995) (it was an abuse of discretion to allow the expert testimony of a "police practices and procedures expert" stating his opinion as to why each action the officers took was consistent with "nationally accepted standards," and his overall opinion that the officers' conduct comported with the "standards under the Fourth Amendment," as this was not a fact-based opinion but rather a statement of legal conclusion).

The Board also moves to exclude as legal conclusions Dr. Wingo's opinions that the Board "failed to supervise, control, discipline, assess, and/or investigate" the individual defendants, and failed to "uphold, support, train, follow, adhere to, and enforce compliance with departmental policies." The Court agrees that these are impermissible legal conclusions and must be excluded. Dr. Wingo may testify, however, as to prevailing standards in the field of law enforcement for supervision, training, investigation and discipline of officers, facts in the record concerning the individual defendants' post-police academy training; discipline imposed by the SLMPD on the

individual defendants and other police officers; whether the SLMPD enforced its written policies; and whether such enforcement was uniformly and consistently applied.

**Conclusion**

For the foregoing reasons, the defendants' motions to exclude the testimony of plaintiffs' expert Dr. Angela Wingo will be granted in part and denied in part, as set forth herein. Based on the Court's review of Dr. Wingo's report and deposition, the Court reiterates that plaintiffs' counsel will need to be very careful in phrasing questions to Dr. Wingo, so as to elicit her testimony without obtaining responses that invade the province of the jury or consist of legal conclusions. The undersigned will require Dr. Wingo to be present at the final pretrial conference in the <u>Cox</u> and <u>Jones</u> cases to ensure that she understands the permitted scope of her testimony.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions in limine to exclude the testimony of plaintiffs' expert witness Dr. Angela Wingo, Ph.D., are **GRANTED in part** and **DENIED in part** as set forth above. [Docs. 154, 156 and 159] in <u>Jones v. Slay</u>, 4:12-CV-2109 CAS; [Docs. 86, 88] in <u>Holmes v. Slay</u>, 4:12-CV-2333 HEA; and [Docs. 54, 56] in <u>Cox v. Slay</u>, 4:13-CV-427 CAS.

**IT IS FURTHER ORDERED** that the pretrial consolidation of these actions is now terminated. All future filings shall bear the appropriate individual case caption and be filed in the separate case to which they pertain.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall docket this Order in <u>Jones v. Slay</u>, 4:12-CV-2109 CAS; <u>Holmes v. Slay</u>, 4:12-CV-2333 HEA; and <u>Cox v. Slay</u>, 4:13-CV-427 CAS.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this __20th__ day of June, 2014.