**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHEN JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-2109 CAS |
| | ) | |
| FRANCIS G. SLAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter under 42 U.S.C. § 1983 is before the Court on separate motions for summary judgment filed by defendants Vincent Carr and Shell Sharp. The motions are fully briefed and ready for decision. For the following reasons, defendants Carr and Sharp's motions for summary judgment will be granted in part, denied in part and denied in part as moot.

## I.  Background

This action was filed on November 9, 2012 by plaintiff Stephen Jones against the members of the Board of Police Commissioners of the St. Louis Metropolitan Police Department (collectively the "Board") and two former St. Louis police officers, defendants Carr and Sharp. Plaintiff alleges that his federal civil rights were violated when he was arrested, convicted and imprisoned for a period of over twelve years based on false evidence manufactured by defendants Carr and Sharp. Specifically, plaintiff alleges that Carr and Sharp conspired with each other and made a false affidavit to obtain a search warrant for plaintiff's parents' apartment, falsely claimed that while executing the search warrant they observed plaintiff holding a plastic bag containing $15,000 worth of cocaine base, stole $5,200 belonging to plaintiff's father during the search of the residence, suppressed exculpatory evidence, arrested plaintiff and falsely testified against him at trial in order

to prevent any complaints concerning the theft, as part of a pattern of illegal activity on their parts. Plaintiff also alleges that the Board had a policy, or pervasive custom and practice, of reliance on manufactured evidence, and that it failed to train, supervise, control, instruct or discipline the officers under its control in various respects. Plaintiff alleges that as a result of Carr and Sharp's conduct, he was found guilty by a jury of one count of possession with the intent to distribute cocaine base and sentenced to 240 months in prison.

During plaintiff's incarceration, the Federal Bureau of Investigation and the United States Attorney's Office for the Eastern District of Missouri began to investigate Carr and Sharp "for the same illegal activities that resulted in [plaintiff's] wrongful conviction and imprisonment." Amended Complaint at 8, ¶ 24. Plaintiff alleges that as a result of this investigation, defendant Carr pleaded guilty in February 2009 to federal criminal charges of conspiracy to commit wire fraud, wire fraud, making a false statement and obstruction of justice based on facts very similar to those in the instant case, including wrongfully accusing a third party of criminal activity in order to deflect investigation into his theft. See United States v. Carr, No. 4:08-CR-703 ERW (E.D. Mo.). Plaintiff alleges that the investigation also led to defendant Sharp leaving the police department in June 2009 "under charges" of fraudulently concocting affidavits in support of search warrants.

Based on Carr's conviction, plaintiff sought permission from the Eighth Circuit Court of Appeals to file a successive habeas corpus motion seeking relief under 28 U.S.C. § 2255. The United States acquiesced in plaintiff's request and the Eighth Circuit issued an order authorizing plaintiff to proceed with his motion, which was filed in September 2010. After reviewing the evidence presented at plaintiff's trial along with new evidence concerning Carr's corrupt practices, the United States in November 2010 joined in plaintiff's motion to vacate his sentence, stating there was no credible independent evidence to corroborate Carr's testimony against plaintiff. The United

States also admitted that Sharp's testimony was not reliable or credible. On November 10, 2010, this Court, the Honorable Judge Carol E. Jackson presiding, issued an order vacating plaintiff's conviction and ordering the United States Bureau of Prisons to release him from custody immediately.[1] Plaintiff subsequently sought a Certificate of Innocence pursuant to 28 U.S.C. § 2513, which was granted by Judge Jackson on May 12, 2011, who found that plaintiff was actually innocent of the crime for which he was imprisoned for twelve years and eight months.

Plaintiff asserts federal civil rights claims against Carr, Sharp and the Board pursuant to 42 U.S.C. § 1983 and supplemental state law claims against Carr and Sharp for malicious prosecution, wrongful imprisonment and abuse of process.[2]

## II. Legal Standard

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then

---

[1]    See Jones v. United States, 4:10-CV-1748 CEJ (E.D. Mo.).

[2]    Plaintiff's state law claims against the Board defendants for malicious prosecution, wrongful imprisonment and abuse of process were dismissed based on sovereign immunity, by Memorandum and Order and Order of Partial Dismissal of November 7, 2013. (Docs. 96, 97)

shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact, see Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004), and "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005).

As a threshold matter, the Court notes that in response to defendants' Carr and Sharp's Statements of Uncontroverted Material Fact, plaintiff responded as required by Local Rule 4.01(E),[3]

---

[3] Eastern District of Missouri Local Rule 4.01(E) provides as follows:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine

and in addition submitted his own Statements of Additional Material Facts supported by citation to the record.[4] Defendants object to a number of plaintiff's additional facts as being legal conclusions, opinions, irrelevant and/or argumentative. Some of defendants' responses are insufficient under Local Rule 4.01(E) because they fail to articulate how a fact is disputed or do not contain a sufficiently specific reference to the record.

The Court is mindful that in reviewing a motion for summary judgment, it must view the facts in the light most favorable to the non-moving party, give the non-moving party the benefit of any inferences that can logically be drawn from those facts, <u>Matsushita</u>, 475 U.S. at 587, and resolve all conflicts in favor of the non-moving party. <u>Robert Johnson Grain Co. v. Chemical Interchange Co.</u>, 541 F.2d 207, 210 (8th Cir. 1976). For purposes of resolving instant motions, the Court largely adopts plaintiff's statement of additional material facts, although many are controverted by the defendants.

---

issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E. D. Mo. L. R. 4.01(E).

[4] Plaintiff's Statements of Additional Material Facts filed in response to the separate Statements of Uncontroverted Material Facts filed by defendants Carr and Sharp appear to be virtually identical and are the same in all material respects.

### III. Facts

With the foregoing standards in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

**Facts Based on Defendants Carr and Sharp's Statements of Facts**

1. On October 29, 1997, defendant Carr applied for and obtained a state search warrant to search for cocaine base in a two-story, two-family residence located at 2802 Missouri Avenue ("2082 Missouri") in the City of St. Louis. Sharp Ex. A at 1.

2, The target of the search warrant was an individual named Sherrod Greenlaw. Sharp Ex. A.

3. On October 29, 1997, five officers of the St. Louis Metropolitan Police Department ("SLMPD"), including defendant Carr and his partner, defendant Sharp, executed the search warrant at 2802 Missouri. Sharp Ex. B at 7.

4. The police found and seized guns and money during the search and found a bag containing three clear plastic bags that contained crack cocaine. Sharp Ex. B at 9, Sharp Ex. C at 18-19.

5. Plaintiff Stephen Jones was inside his father's apartment in the residence at 2802 Missouri when the police executed the search warrant. Carr Ex. D, Jones Dep. 49-50.

6. The police detained plaintiff on the couch during the search on October 29, 1997. Jones Dep. 67.

7. Defendants Carr and Sharp took plaintiff to the police station after the search on October 29, 1997, and released him about an hour later the same day. Jones Dep. 76-77, 84-85; Carr Ex. B at 10.

8.  On October 31, 1997, defendant Carr drafted the report detailing the incident.  Sharp Ex. B at 11.

9.  On December 15, 1997, a federal warrant was issued for plaintiff's arrest.  Carr Ex. D.

10.  On or about December 24, 1997, plaintiff was arrested by a police officer from an unknown St. Louis County jurisdiction.  Jones Dep. 90-91.

11.  Plaintiff was indicted by a federal grand jury and charged with possession of the illegal drugs allegedly found inside the residence at 2802 Missouri.  Jones Dep. 95.

12.  Defendants Carr and Sharp testified at plaintiff's criminal trial in February 1998.  Transcript of Trial and Sent. ("Tr.") 112-57, 160-79.

13.  Defendants Carr and Sharp each testified they had seen plaintiff holding the drugs in his hand when they entered the premises at 2802 Missouri on October 29, 1997.  Tr. 124-28, 163-64.

14.  Plaintiff did not testify at his criminal trial, but his attorney argued to the jury in closing argument that defendants Carr and Sharp had lied about having seen plaintiff holding drugs in his hand.  Tr. 262-67

15.  The only exhibits offered at plaintiff's criminal trial were the drugs allegedly recovered from 2802 Missouri and the search warrant, affidavit, and return and inventory.  Tr. 4, 116-19, 129-31.

16.  Defendant Carr took photographs of the scene on October 29, 1997, but he claims that the photographs were lost between the time he conveyed them to the SLMPD forensic lab and the time of plaintiff's criminal trial in February 1998.  Tr. 151; Ex. B at 10.

17.  No documentation exists to verify that Carr took the photographs to the forensic lab.  The police report Carr prepared contains chain of custody documentation for the seized guns and drugs, but not the photographs.  Ex. B at 12-20.

18. The jury convicted plaintiff and he was sentenced to 240 months in prison.

19. On November 10, 2010, U. S. District Judge Carol E. Jackson of this Court vacated plaintiff's sentence, and plaintiff was released from federal prison shortly thereafter. Carr Ex. G.

20. On or about March 22, 2011, plaintiff applied to this Court for a certificate of innocence pursuant to 28 U.S.C. § 2513. The United States subsequently joined in the application, and Judge Jackson granted it on May 12, 2011.

### Facts Based on Plaintiff's Additional Statement of Facts

21. On February 27, 1998, plaintiff Stephen Jones was convicted by a jury in this Court of one count of possession with intent to distribute 79.49 grams of cocaine base. Pursuant to sentencing guidelines, plaintiff was sentenced to 240 months in prison, a punishment the Court stated at the time of sentencing was "a draconian sentence, considering the facts of this case." Pl. Ex.1, Tr. 303.

22. Detective Carr's affidavit formed the basis for the search warrant of the Jones apartment at 2802 Missouri. In the affidavit, Carr stated the confidential informant had provided information that had proved reliable and resulted in three prior arrests; the confidential informant had advised Detective Carr that Sherrod Greenlaw was selling cocaine base out of the Jones apartment at 2802 Missouri; the confidential informant had been inside the Jones apartment within 18 hours of the execution of the affidavit and had observed a "large amount of cocaine base" inside the residence. Sherrod Greenlaw was seen using his cell phone on plaintiff's father Samuel Jones' front porch by the investigating Detectives. Sherrod Greenlaw was the sole subject of the search warrant. Pl. Ex. 2, Carr Aff. in Support of Search Warrant.

23. Sherrod Greenlaw was detained by Carr and Sharp and brought to 2802 Missouri at the time of the execution of the search warrant. Ex. 3, Police Report, JONES 1500-1501.

24. During the time period around plaintiff's arrest, Sherrod Greenlaw, the subject of the search warrant, had constant access to the keys to Samuel Jones' apartment because Greenlaw was dating Samuel Jones' daughter, Monica Jones. Greenlaw would babysit Monica Jones' children while she was at work at the U.S. Post Office. Greenlaw came and went from the Jones' home on a regular basis to pick up and drop off the children. Ex. 4, Aff. of Samuel Jones ("Jones Aff.") ¶ 4.

25. Samuel Jones believes the cocaine base belonged to Sherrod Greenlaw and that Greenlaw was using Jones' home as a "safe house." Jones Aff. ¶ 4.

26. Stephen Jones did not live at his father's apartment. Jones Aff. ¶ 3; Jones Dep. 32-34. Samuel Jones' home at 2802 Missouri was a two-bedroom apartment. Jones Aff. ¶ 2. Plaintiff's father, Samuel Jones, and his mother Doris Jones, a bus driver, lived in one bedroom of the home. Id. ¶ 2. Samuel Jones' granddaughter Kiihandra Jones and his grandniece Taquita Wren shared the other bedroom. Samuel Jones' brother-in-law Michael Wren was living in the basement. Id.

27. On the date of his arrest, October 29, 1997, Stephen Jones was primarily residing at an apartment, at 2506 Lafayette in the City of St. Louis with his girlfriend Loukeena Dixon. Jones Aff. ¶ 3; Jones Dep. 32-34.

28. According to the police report prepared by Carr, on October 29, 1997, "Upon entering the residence, Detectives Carr and Sharp observed a black male run toward the rear of the residence holding a plastic bag in his right hand. Detectives Carr and Sharp gave chase after the male into the kitchen, where he dropped the plastic bag onto the kitchen floor and attempted to open the rear door of the residence," when he was detained by Carr and Sharp. Pl. Ex. 3, Police Report, JONES 1501.

29. According to the police report prepared by Carr, the bag containing the crack cocaine was found on the kitchen floor. Pl. Ex. 3, Police Report, JONES 1501-1502.

30. There was no physical evidence gathered or disclosed in the underlying criminal proceeding, such as fingerprints or photographs, that linked Stephen Jones to the cocaine base. Tr. 149:11-22; 151:20-22.

31. There is no indication in the police report and no testimony at trial to the effect that any of the other detectives on the front porch saw Stephen Jones in possession of the freezer bag or pursued Stephen Jones into the kitchen where Carr and Sharp alleged he ran. Pl. Ex. 3, Police Report.

32. The police report prepared by Carr states that "[p]hotographs of the scene and seized items were taken by Detective Carr." Ex. 3, Police Report, JONES 1503. However, the photographs allegedly taken by Detective Carr of the freezer bag where it was allegedly recovered in the kitchen were not provided to prosecutors because "somehow they got lost" by the forensic lab, according to Detective Carr. Tr. 151:20-22.

33. Stephen R. Welby, the Assistant United States Attorney in charge of the prosecution of Stephen Jones, reviewed Carr's police report and discussed both Carr and Sharp's testimony with them before calling them to testify. Mr. Welby relied on what Carr put in the police report as well as what Carr and Sharp told him in pre-trial interviews in prosecuting Stephen Jones. Ex. 6, Aff. of Stephen R. Welby ¶¶ 2-3.

34. Without Carr's police report and the information provided in Carr and Sharp's pre-trial interviews, Mr. Welby would not have prosecuted Stephen Jones. Welby Aff. ¶ 4.

35. Kiihandra Jones and Curtiz Prago testified at plaintiff's criminal trial that Stephen Jones himself opened the front door for the police. They testified that the police immediately cuffed Stephen Jones when they entered the apartment and seated him in the front/living room with the others who were present in the apartment while the apartment was searched. Both witnesses denied

that either Stephen or the officers ever ran down the hallway and into the kitchen, and testified that after the police searched the apartment, the police showed everyone in the living room the bag of cocaine base.  Tr. 236:18–237:5, 247:6-16.

36.  Kiihandra Jones testified at trial that a police officer first showed the freezer bag to her while that officer was in the apartment's middle room, which was her and Taquita Wren's bedroom. Tr. 239:17-20.

37.  Plaintiff's father, Samuel Jones, testified that after he arrived home Detective Sharp told him that the officers had actually found the freezer bag of cocaine base in the dresser by the window in the middle bedroom.  Tr. 221-22.

38.  On the date of plaintiff Stephen Jones' arrest, his father Samuel Jones had $5,200.00 hidden under the insulation/lining of a winter boot in the back of his closet. Mr. Jones had hidden cash in his closet ever since his family settled a wrongful death case arising out of the death of his mother, Lillie Mae Jones, from which he received approximately $10,000.00.  The money that Samuel Jones had hidden on the date of his son's arrest also came from his employment as a handyman, gardener and running errands.  Samuel Jones had never used a bank and routinely kept cash in his home.  Jones Aff.

39.  Samuel Jones arrived home while the police were still at his apartment with Stephen Jones in custody.  After learning of the search he asked to go search the closet to see if the money was still there.  The police would not let him look.  After the police left he looked and discovered that the money was no longer in the boot.  Jones Aff.

40.  Thereafter Samuel Jones called Detective Carr and told him about the missing money. Samuel Jones told other police officers, as well as Stephen Jones' criminal defense attorney, Peter M. Cohen.  Samuel Jones told members of the press, including Betsy Bruce, about the missing

money "every chance that [he] got." The press always told him to "bring us proof" because, as they said, it was otherwise Mr. Jones' word against the police. Jones Aff.

41. Attorney Peter M. Cohen represented Stephen Jones in this Court at the trial of the criminal case. Mr. Cohen avers that he was advised at the time by Samuel Jones and Stephen Jones as to each of the circumstances set forth in Samuel Jones' Affidavit. Ex. 7, Aff. of Peter M. Cohen.

42. Mr. Cohen states that Samuel Jones told him about the missing money, but it was decided not to use at trial the issue of money being stolen from the apartment, because it was Mr. Jones' word against the police and because "it could look to the jury like a desperate act and an attempt to shift the focus of the case to an irrelevant fact." Cohen Aff.

43. Defendants Carr and Sharp detained Sherrod Greenlaw a second time on October 29, 1997, at 7:30 p.m. In the police report prepared by Defendant Sharp, Sharp alleges that after receiving "complaints about suspected narcotics sells," Sharp witnessed a hand-to-hand transaction involving Greenlaw. The officers pulled over Greenlaw's vehicle and arrested him after he attempted to discard crack cocaine under the vehicle. Ex. 3, Police Reports, JONES 1513.

44. According to the SLMPD's incident reporting system, the police report of Greenlaw's arrest and the police report of plaintiff Stephen Jones' arrest were both prepared on the same day, October 31, 1997, two days after the search of 2802 Missouri. See Ex. 3, Police Reports, JONES 1494 and 1507. However, the report prepared by Carr does not reference the fact that Carr was involved in detaining Greenlaw again later on the same day. The report prepared by Sharp relating to the second arrest of Greenlaw merely states that Greenlaw "was early [sic] detained by the detectives in a narcotic investigation." Id. at 1514. The report does not state where or when Greenlaw had been earlier detained, nor does it refer to plaintiff Stephen Jones.

45. In Carr's deposition testimony, when asked if the police report, or a supplemental report, should have disclosed that Greenlaw had been arrested later that same day for selling cocaine, he stated that it should have been included if it were "pertinent information" and that he "probably would put a statement in there reflecting back to that police report." Carr Dep. 65-67.

46. Former Assistant United States Attorney ("AUSA") Stephen Welby does not recall being aware that Sherrod Greenlaw had been arrested again later on the same day as the execution of the search warrant and arrest of Stephen Jones, or that Detective Shell Sharp prepared a separate police report stating that Greenlaw was arrested later on in the same day for doing sales of crack cocaine on the street. Welby Aff. ¶ 6.

47. Stephen Welby believes that had he known these facts, he would have disclosed the report of the subsequent arrest of Greenlaw to defense counsel in the prosecution of Stephen Jones. Welby Aff. ¶ 7.

48. A federal investigation into corruption in the St. Louis Metropolitan Police Department was initiated in 2007 and eventually led to the indictments of police officers. Among the officers indicted was Defendant Vincent Carr. United States v. Carr, No. 4:08-CR-703 ERW (E.D. Mo.) In February 2009, Carr pleaded guilty to five felony charges in this Court stemming from the investigation into his corrupt activities. These charges included wire fraud, wire fraud conspiracy, two counts of lying to Special Agents of the Federal Bureau of Investigation, and one count of obstruction of justice arising from Carr's misconduct and corrupt practices during a drug raid in June 2008 and Carr's subsequent attempts to cover up his actions. Carr stole money and drugs from a drug dealer, and then protected the dealer from investigation so he could keep some of the seized funds. The officers then planted evidence in order to frame another person for the crime. Pl.'s Ex. 9, Carr Amended Judgment; Pl.'s Ex. 10, Tr. of Carr Guilty Plea in Case No. 4:08-CR-703 ERW.

49.  In his criminal case, Carr admitted that he obtained a search warrant for the first floor apartment of a building at 1475 Arlington Avenue in the City of St. Louis, saying he had information that drugs were sold and stored there by an individual named "Black."  Carr and Detective Bobby Lee Garrett first stopped the building owner, C.C., who did not live there and who stated that any drugs on the premises belonged to the residents.  Carr and Garrett then stopped the vehicle of a second floor resident, J.S., and questioned him.  J.S. admitted he had crack cocaine, a firearm and $32,000 cash in his apartment.  J.S. was handcuffed and placed in the police car.  Tr. of Carr Guilty Plea 9-10.

50.  Carr admitted that on June 6, 2008, along with other officers called to assist, he transported both C.C. and J.S. back to the first floor residence at 1475 Arlington Avenue, where a search of the first floor premises was conducted pursuant to the state search warrant.  C.C. and J.S. were kept handcuffed and seated in the front room of the first floor residence.  Cocaine, marijuana, and several firearms were located and recovered from the kitchen and a back bedroom during the search of the first floor premises.  Tr. of Carr Guilty Plea 19.

51.  While other officers were conducting the search of the first floor premises, Garrett entered into J.S.' bedroom on the second floor on two separate occasions and recovered crack cocaine, a loaded 9mm pistol and approximately $32,000 in cash.  Garrett brought the crack cocaine, the loaded pistol, and a bundle containing $3,710 back into the first floor premises and falsely advised the officers searching there that he'd recovered the items from a couch in the middle room of the first floor premises.  Garrett kept the remainder of the currency without reporting it.  Defendant Carr admitted in his guilty plea that Garrett gave him approximately $3,300 of the currency taken from J.S.' second floor bedroom.  Tr. of Carr Guilty Plea 19-20.

14

52.  Carr and Garrett released J.S. following the search of 1475 Arlington Avenue without charging him relative to his possession of crack cocaine and the pistol, so that J.S. would not complain about and report the theft of his money.  Carr and Garrett arrested C.C. and booked him for the possession of all of the illegal drugs recovered during the search of the first floor premises at 1475 Arlington Avenue as well as the crack cocaine taken by Garrett from J.S.' bedroom on the second floor at 1475 Arlington Avenue, in order to conceal the fact that Garrett had entered the second floor premises and taken J.S.' crack cocaine, pistol and money.  Tr. of Carr Guilty Plea 20.

53.  Defendant Carr filled out a false police report in an effort to conceal Carr and Garrett's crime.  Specifically, in order to conceal the fact that Garrett had taken the crack cocaine, pistol and money from J.S.' second floor bedroom, the police report prepared by Carr failed to include the facts that the officers had stopped J.S. in his vehicle, had handcuffed and detained J.S., and had transported J.S. back to the first floor premises at the Arlington Avenue address where J.S. remained until completion of the search.  Tr. of Carr Guilty Plea 21.

54.  Further, the police report prepared by defendant Carr failed to include the fact that J.S. had admitted to possessing a large amount of crack cocaine, a pistol, and a large amount of United States currency inside his bedroom on the second floor at 1475 Arlington Avenue, again to conceal the fact that Garrett had taken the crack, pistol, and money from J.S.' second floor bedroom.  Tr. of Carr Guilty Plea 21.

55.  The police report prepared by Carr failed to include the fact that Garrett had searched the second floor bedroom of J.S. and located and recovered the crack cocaine, the loaded pistol and United States currency, in order to conceal those facts, and falsely stated that Garrett had located and recovered J.S.' crack cocaine, the pistol and a portion of the currency in a couch in the middle room of the first floor premises.  Tr. of Carr Guilty Plea 21-22.

56.  On June 16, 2008, in order to further conceal their actions in entering into the second floor of the Arlington address, stealing J.S.' money, and charging C.C. with possession of all the drugs recovered, defendant Carr prepared and filed with the Circuit Court Clerk a "Return and Inventory" form relative to the search warrant, which falsely stated that the crack cocaine, pistol and $3,710 located and recovered by Garrett in J.S.' second floor bedroom was recovered from the first floor premises.  Tr. of Carr Guilty Plea 22-23.

57.  On June 6, 2008, in order to further conceal their actions, defendant Carr submitted all of the illegal drugs located and recovered during the search of the first floor premises at Arlington as well as the crack cocaine located and recovered by Garrett from the second floor bedroom to the laboratory for testing under the suspect name C.C., with no mention of J.S.  Tr. of Carr Guilty Plea 23.

58.  In order to further conceal their actions in entering into the second floor of 1475 Arlington, stealing J.S.' money, and charging C.C. with possession of all of the drugs recovered, Carr and Garrett falsely stated during a meeting with FBI Special Agents on September 17, 2008, that no other civilians were present at the Arlington Avenue residence during the June 6, 2008 search other than C.C., when in fact J.S. was present, and Carr and Garrett falsely stated that neither of them had gone upstairs to the second floor premises and conducted any type of search on June 6, 2008, when in fact Garrett had.  Further, Carr and Garrett failed to advise the FBI Special Agents that in connection with the search of 1475 Arlington Avenue they had detained J.S., who admitted possession of the crack cocaine, a pistol and approximately $32,000 located and recovered from his second floor bedroom at the Arlington Avenue residence.  Tr. of Carr Guilty Plea 24.

59. During a meeting with FBI Special Agents on October 1, 2008, Carr concealed and failed to turn over handwritten notes made during the June 6, 2008 search in order to impair the notes' availability for use before a federal grand jury proceeding. Tr. of Carr Guilty Plea 24-25.

60. Defendant Carr's Internal Affairs Division ("IAD") File reflects (1) a complaint from 1995 that Carr and Sharp physically abused a subject; (2) a complaint from August 1997 that Carr seized $42,000 during the execution of a search warrant, but only reported $25,000 and stole the remainder; (3) a complaint of physical abuse by Sharp and Carr from 2000; and (4) a complaint from 2007 that Carr and Detective Bobby Lee Garrett entered a residence without a search warrant, physically abused a subject, planted a gun and narcotics on the individual, and stole $1,200 from his girlfriend. Pl. Ex. 11, Corrected Carr AID File, at JONES 559, 883, 882.

61. In 2009, defendant Sharp became the target of an Internal Affairs investigation into police corruption. There were allegations that Sharp had made false statements about informants and surveillance activities. The investigation was triggered when defendant Sharp was cross-examined in an evidentiary hearing with examples of his identical search warrant affidavits. Pl. Ex. 12, Sharp AID File at Jones 0234 and 0240; Pl. Ex. 13, Mem. Supp. Mot. Suppress Evid., United States v. Farad, No. 4:08-CR-230 RWS (E.D. Mo.) at 14.

62. According to the testimony of Captain Hayden, the head of SLMPD Internal Affairs at the time, the investigation was triggered by questions about whether a certain confidential informant could have been "available" to provide information to defendant Sharp, as defendant Sharp had testified. Pl. Ex. 14, Hayden Dep. 19-21.

63. The investigation into Sharp discovered a large number of affidavits in support of search warrants that were "starkly similar" with each other, with the only differences being in times, locations and targets. Hayden Dep. 24-26.

64. The Department found that "a review of several search warrants investigated by Police Officer Shell Sharp, DAN 3183 revealed numerous inconsistencies along with inaccurate information." Sharp AID File at Jones 0390; Jones 0240; Jones 0291 to 0379; Collection of Sharp AFF.; <u>Farad</u> Mem. Supp. Mot. Suppress Evid. at 14.

65. Officer Sharp chose to resign from the SLMPD rather than answer questions from Internal Affairs regarding the investigation into the legitimacy of his testimony and search warrant affidavits. Hayden Dep. 31-32.

66. Sharp had a prior history of being investigated by Internal Affairs for misconduct. Defendant Sharp had complaints for physical abuse in 1995 and 2000. The 1995 complaint was sustained by the Department as to Sharp for violation of Department procedures, because he was found to have been associating with a known felon and permitting the felon to live on his property. Sharp AID File at Jones 0395.

67. Officer Sharp had a complaint against him that he planted narcotics on a subject and falsely arrested him during an arrest in 2000. Sharp AID File at Jones 0394. Officer Sharp had a complaint against him that he planted narcotics on a subject during an arrest in 2001. <u>Id.</u> at Jones 0391. Officer Sharp had a complaint against him for stealing during execution of a search warrant in January 2006. <u>Id.</u> at Jones 0393.

68. Officer Sharp had a sustained complaint in the year 2000 based on a complaint of stealing $1,480.00 from a woman he had arrested. Sharp received a written reprimand. Sharp AID File at Jones 0394.

69. Captain Hayden, a former AID commander, testified that Officer Sharp should have been terminated if he had a complaint sustained for theft. The only documentation available for the 2000 complaint of stealing is the outcome that the complaint was sustained. Hayden Dep. 57-58.

Lieutenant Colonel Paul Nocchiero, another former AID commander, testified that an officer with a sustained stealing charge should be terminated. Pl. Ex.15, Nocchiero Dep. at 76.

70. In joining plaintiff's Motion to Vacate, Set Aside or Correct his criminal conviction under 28 U.S.C. § 2255, the Government admitted there was no credible evidence that plaintiff committed the crime for which he was convicted and spent twelve years and nine months in prison, and stated as follows:

> [T]he movant's position from the outset has been that the crack cocaine was neither his nor in his possession. The Government's case against movant was based on the testimony of Vincent Carr who, armed with a search warrant, entered the residence and claimed to have observed the movant to drop a freezer bag containing the illegal drugs as the movant fled towards the kitchen. While other police officers were in the vicinity, they were outside the residence and there is no credible independent evidence corroborating Carr's testimony. Movant's contention is that Vincent Carr lied about the movant's possession of the drugs just as he (Vincent Carr) lied concerning the 2008 drug raid which resulted in Carr's conviction. Whether true or untrue, it is a contention that the Government is unable to refute.

Pl. Ex. 16, United States' Motion and Response to Motion to Vacate at 3-4 (footnote omitted).

> . . . .

> [B]ecause of the subsequent convictions related to his official duties by the police officer on whose testimony movant's conviction rests, the Government has lost confidence in the probity of movant's conviction. As observed by the United States Supreme Court in <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935), it is as much a prosecutor's duty to prevent a wrongful conviction as it is to bring about a just one.

<u>Id.</u> at 4.

> The movant's conviction was based on Vincent Carr's testimony that he saw the movant drop the freezer bag containing the crack cocaine. The Government can no longer vouch for that testimony nor corroborate that testimony by independent credible evidence. Consequently, the Government would not seek a retrial of the movant. Under the unique circumstances presented by this case, then, the Government joins the movant's request for the vacation of the judgment entered in *United States v. Stephen Jones*, EDMO No. 4:98 CR 12 CEJ, and an order that the movant be discharged.

<u>Id.</u> at 4.

71. The government admitted in its Motion and Response joining in plaintiff's Motion to Vacate that defendant Sharp's testimony in the criminal case was not reliable or credible, stating: "While there was another officer inside the residence who might corroborate Carr's testimony, the Government is similarly unable to vouch for that officer's credibility." Id. at 3, n.1

72. The Honorable Carol E. Jackson of this Court issued a Certificate of Innocence pursuant to 28 U.S.C. § 2513 on May 12, 2011, which stated in part "it is hereby certified that movant Stephen Jones is actually innocent of the charge of possession of cocaine base with intent to distribute set forth in the indictment in Case No. 4:98-CR-12 (CEJ)." Pl. Ex. 17, Amended Certificate of Innocence at 5, Jones v. United States, No. 4:10-CV-1748 CEJ (E.D. Mo.) (Doc. 16).

73. In the Certificate of Innocence, Judge Jackson found that "apart from the now-discredited testimony of Carr and Sharp, there is no evidence that Jones had possession of cocaine base, either at the time of the search or at any earlier time. . . . . When the non-credible evidence is stripped away, all that remains is the evidence of Jones' presence at the apartment. That act, however, was not a crime." Id. at 4.

## IV. Discussion

### A. Count I

In Count I of the Amended Complaint, plaintiff alleges that defendants Carr and Sharp violated his constitutional rights by the following acts:

a) Preparing a false affidavit in support of a search warrant for the 2802 Missouri Ave. premises, when Defendants lacked probable cause to search the premises;

b) Planting evidence at the scene and suppressing relevant evidence during the search of the premises and thereafter during the time period leading up to Plaintiff's trial, including the suppression and destruction of photographs and the failure to obtain fingerprints on the bag of crack cocaine;

c) Providing false information in the police report and in other documents and reports prepared pursuant to their duties with the Department;

d) Providing false information to federal prosecutors in order to wrongfully, illegally and unconstitutionally deprive Plaintiff of his freedom;

e) Framing Plaintiff for a crime he did not commit and obtaining his conviction in order to cover up the theft of $5,200 belonging to Plaintiff's father; and

f) Allowing Plaintiff to languish in prison for almost 13 years, despite Defendants' knowledge that Plaintiff did not commit the crime alleged.

Am. Complaint at 16. Count I asserts that plaintiff was incarcerated without due process of law and that defendants Carr and Sharp's actions violated plaintiff's constitutional rights "including his due process rights to a fair trial and his right to discovery of exculpatory evidence, and other rights preserved under the Fourth, Fifth and Fourteenth Amendments," Am. Complaint at 16-17. The defendants move for summary judgment on all of plaintiff's claims in Count I.

### i. *Fifth Amendment Claims*

Defendant Carr moves for summary judgment on plaintiff's claims under the Fifth Amendment, asserting that the facts alleged by plaintiff do not state a claim under the Fifth Amendment. Carr does not develop this conclusory argument any further or offer any citation to supporting case law. Defendant Sharp does not mention plaintiff's Fifth Amendment claims in his motion.

Despite Carr's failure to support his argument, he is entitled to summary judgment on plaintiff's due process claims to the extent they are brought under the Fifth Amendment, because the Fifth Amendment's Due Process Clause applies only to the federal government and Carr was not a federal employee. See Livers v. Schenck, 700 F.3d 340, 351 (8th Cir. 2012); Baribeau v. City of Minneapolis, 596 F.3d 465, 484 (8th Cir. 2010).

Defendant Sharp is also entitled to summary judgment on plaintiff's Fifth Amendment claims, even though he did not move for judgment on this basis, because he was not a federal employee.  See Madewell v. Downs, 68 F.3d 1030, 1049-50 (8th Cir. 1995) (court may grant summary judgment in favor of a non-moving party on its own initiative where the losing party had sufficient notice in the form of the summary judgment motion filed by another party, and the non-moving party's right to summary judgment turned on the same issue presented by the motion of the moving party); see also Chrysler Credit Corp. v. Cathey, 977 F.2d 447, 449 (8th Cir. 1992) (per curiam) (same).

### ii.  *§ 1983 Malicious Prosecution and False Arrest Claims*

Defendant Carr moves for summary judgment on Count I "to the extent" plaintiff "intends to assert Fourth Amendment claims for malicious prosecution or false arrest."  Carr Mem. Supp. Mot. Summ. J. at 4.  Defendant Sharp moves for summary judgment on plaintiff's claims against him in Count I for false arrest.  Plaintiff responds that Count I of his complaint does not assert § 1983 claims for either malicious prosecution or false arrest.  Accordingly, this aspect of defendants Carr and Sharp's motions for summary judgment will be denied as moot.

### iii.  *Due Process Claims*

Both the Amended Complaint and the defendants' summary judgment motions refer generically to plaintiff's "due process" claims in Count I.  Defendants Carr and Sharp's motions for summary judgment separately address plaintiff's claims that they (1) suppressed exculpatory evidence, and (2) used false or manufactured evidence against him.  The former are properly analyzed as procedural due process claims, while the latter are substantive due process claims.

a. <u>Procedural Due Process Claims</u>

Plaintiff argues that defendants Carr and Sharp recklessly or intentionally suppressed exculpatory evidence in violation of his Fourteenth Amendment right to procedural due process. Specifically, plaintiff contends that these defendants suppressed the following material evidence: (1) photographs showing the location of the bag of crack cocaine discovered in a bedroom, not on the floor of the kitchen where the police report falsely claimed that Carr and Sharp found it after seeing it in plaintiff's hands; (2) information that Carr and Sharp arrested Sherrod Greenlaw, the target of the search warrant, for street sales of crack cocaine later the same day of plaintiff's arrest; and (3) evidence of Carr and Sharp's corrupt and illegal practices.

As the Supreme Court held in <u>Brady v. Maryland</u>, "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution." 373 U.S. 83, 87 (1963). <u>Brady</u>'s protections extend to actions of investigating officers, but "an investigating officer's failure to preserve evidence potentially useful to the accused or their failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith." <u>White v. McKinley</u>, 519 F.3d 806, 814 (8th Cir. 2008) ("<u>White I</u>"). "[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial." <u>Villasana v. Wilhoit</u>, 368 F.3d 976, 980 (8th Cir. 2004). "Consequently, to be viable, [a plaintiff's] claim must allege bad faith to implicate a clearly established right under <u>Brady</u>." <u>White I</u>, 519 F.3d at 814.

<u>Brady</u> "does not require the plaintiff to show that the jury in his criminal trial would have acquitted him or that he was innocent." <u>White v. McKinley</u>, 605 F3d 525, 537-38 (8th Cir. 2010) ("<u>White II</u>"). "The question is not whether the defendant would more likely than not have received

a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

The Court examines plaintiff's procedural due process claims separately as to each defendant.

*(1) Defendant Sharp*

(a) Police Report - Arrest of Sherrod Greenlaw

Plaintiff asserts that Sharp failed to disclose to the prosecutor and in the police report of Sherrod Greenlaw's arrest that when Sharp and Carr arrested Greenlaw for selling crack cocaine later the same day plaintiff was arrested, Greenlaw–who was the target of the search warrant at 2802 Missouri–had been detained earlier that same day and transported to 2802 Missouri pursuant to the warrant. Plaintiff argues that even though partners Carr and Sharp's reports of plaintiff's and Greenlaw's arrests were prepared on the same day, neither report refers to the other arrest and no supplemental report was ever prepared connecting the two incidents, which would have alerted prosecutors to Greenlaw's second detention and arrest and its connection to the case against plaintiff. Plaintiff states that Carr admitted in his deposition that the evidence of Greenlaw's arrest would have been "pertinent," and in that type of circumstance, Carr generally would probably reference the other police report in his report of plaintiff's arrest. Plaintiff also cites the affidavit of Stephen Welby, the former Assistant United States Attorney who prosecuted plaintiff, that if Mr. Welby had known about the police report of Greenlaw's arrest, he would have disclosed it to plaintiff as exculpatory evidence.

Plaintiff argues that evidence Greenlaw was arrested for selling crack cocaine on the same day crack cocaine was purportedly discovered at the 2802 Missouri residence would have been powerful evidence that the drugs belonged to Greenlaw, the original target of the investigation, and

not to plaintiff. Plaintiff contends the reasonable inference from the facts is that Carr and Sharp were acting together, in bad faith, and intended to deprive him of a fair trial by not disclosing the exculpatory evidence of Greenlaw's arrest.

Sharp counters that plaintiff offers no explanation as to how an alleged failure to inform plaintiff of "freely available public information" regarding Greenlaw's arrest constitutes bad faith on his part. Sharp also argues that no evidence was suppressed, as plaintiff testified that he knew who Greenlaw was, and Greenlaw admitted to plaintiff on the night of the arrests that the drugs found at 2802 Missouri belonged to him. Sharp contends that plaintiff thus "admittedly had possession of similar, and arguably superior, information to defend himself." Defendant Sharp did not cite any cases in support of his argument in his summary judgment memorandum, but in his reply memorandum cited United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001) ("The government does not suppress evidence in violation of Brady by failing to disclose evidence to which the defendant had access through other channels.").[5]

Sharp's argument that information regarding Greenlaw's arrest was "public" and "freely available" is unsupported by any citation to record evidence, case law or statutes. Sharp does not assert that plaintiff testified he knew Greenlaw had been arrested, only that Greenlaw admitted the crack cocaine was his. In contrast, plaintiff alleges that Sharp suppressed the fact that Greenlaw–the subject of the warrant at 2802 Missouri–was arrested by Sharp and Carr for selling street quantities of crack later the same day plaintiff was allegedly found holding crack by Sharp and Carr during their execution of the warrant. Plaintiff offers evidence that information concerning Greenlaw's

---

[5]    Sharp as the moving party bears the burden to establish his entitlement to summary judgment as a matter of law. Sharp must therefore cite case law to support his arguments in the memorandum in support of his summary judgment motion, as opposed to waiting to offer support in his reply memorandum. The latter smacks of sandbagging.

arrest was not known by the AUSA who prosecuted him, Mr. Welby, who believes he would have disclosed the evidence as exculpatory if he had known of it. The allegedly suppressed evidence possessed an apparent exculpatory value, see California v. Trombetta, 467 U.S. 479, 489 (1984), and plaintiff has alleged that Sharp acted in bad faith in suppressing it.

Nonetheless, the Court concludes that Sharp is entitled to summary judgment on this claim. Plaintiff testified in his deposition, as cited by defendant Carr but not by defendant Sharp, that after plaintiff was arrested and it was clear the case was going to trial, Greenlaw offered to come forward and state that the crack cocaine was his. Plaintiff testified he told his attorney Mr. Cohen about this offer and asked if it would help, and the attorney responded that it would not, "Because all they're going to do is say you was trying to discard the drugs for Greenlaw." Jones Dep. 178:1-14. Based on this testimony, it is clear plaintiff and his trial counsel obtained information from another source that was closely related to and more exculpatory than the information plaintiff alleges was suppressed by Sharp. As a result, plaintiff cannot show there is a remaining fact issue as to whether a Brady or procedural due process violation occurred based on Sharp's failure to disclose information plaintiff had through other channels. See Zuazo, 243 F.3d at 431.

Defendant Sharp's motion for summary judgment should therefore be granted on plaintiff's procedural due process claim in Count I to the extent it is based on the alleged suppression of exculpatory evidence regarding Sherrod Greenlaw's arrest.

### (b) Photographs of Seized Drugs

Sharp also moves for summary judgment to the extent plaintiff alleges in Count I that Sharp was involved in suppressing photographs of the crack cocaine found at 2802 Missouri. Sharp argues that plaintiff admitted in his deposition he has no evidence Sharp played any role in suppressing the photographs. In opposing Sharp's motion for summary judgment, plaintiff does not offer any facts

or argument to support a procedural due process claim against Sharp, as opposed to Carr, for the alleged suppression of the photographs. Sharp is therefore entitled to summary judgment on this aspect of plaintiff's procedural due process claim in Count I.

(c) Evidence of Sharp's Corruption

In opposing Sharp's motion for summary judgment on Count I, plaintiff argues that a Brady claim can exist for suppression or concealment of exculpatory information when police officers conceal their own pattern of misconduct which, if disclosed, would have impeached their testimony and credibility, citing Thompson v. City of Chicago, 722 F.3d 963 (7th Cir. 2013). Plaintiff argues he has shown substantial evidence of Sharp's corruption, and that his conviction was set aside because evidence of Sharp and Carr's corruption impeached the credibility of their testimony to such an extent it no longer held any probative value.

Sharp replies that plaintiff was tried in February 1998 and therefore any actions Sharp may have taken after February 1998 could not have been suppressed because they had not yet occurred. Sharp asserts that the record shows he had only one sustained complaint as of February 1998, for violation of a departmental procedure that resulted in a written reprimand and was not similar to the claims plaintiff makes in this case, and that the evidence of corruption plaintiff cites dates from February 2007 to July 2008. Sharp argues that plaintiff cannot show there would have been a reasonable probability of a different result at his trial if this information had been known, citing Kyles, 514 U.S. at 434.

The Court concludes that Sharp has established he is entitled to summary judgment on plaintiff's claim of a procedural due process violation for failure to disclose a pattern of misconduct, as no such pattern existed at the time of plaintiff's trial in February 1998. Because Sharp had only one sustained complaint at that time, which was dissimilar to plaintiff's claims here, plaintiff has

not shown the existence of a fact issue as to whether there is a reasonable probability he did not receive a fair trial because of the failure to disclose this evidence. See Kyles, 514 U.S. at 434. The evidence concerning Sharp's conduct as of 1998 is unlike the extensive evidence in Thompson of a long-standing pattern and practice of police corruption before Thompson's arrest, by officers who regularly fabricated evidence, conducted illegal searches, made false arrests, pursued false criminal charges, and covered up their wrongful conduct by filing false police reports and giving false testimony. 722 F.3d at 972.

Because the Court concludes defendant Sharp is entitled to summary judgment on all of plaintiff's procedural due process claims against him in Count I, it does not reach Sharp's qualified immunity argument.

### (2) Defendant Carr

#### (a) Suppression of Photographic Evidence

Defendant Carr moves for summary judgment on plaintiff's claim in Count I that Carr violated his procedural due process rights and Brady by suppressing photographs taken during the warrant execution at 2802 Missouri that showed the crack cocaine was found in a bedroom and not in plaintiff's hands or on the kitchen floor.[6] In support, Carr argues that the photographs were lost, and plaintiff "has not discovered any evidence that would shed light on the whereabouts or provenance of the missing photographs." Carr Mem. Supp. Mot. Summ. J. at 7

Plaintiff responds that it is uncontroverted Carr took photographs of the scene where the bag containing crack cocaine was found at 2802 Missouri, and that Carr claimed he took the photos to the police forensic lab but they were somehow lost. Plaintiff states that Carr was admittedly

---

[6] Defendant Carr's motion for summary judgment does not mention any other aspect of plaintiff's procedural due process claims in Count I.

responsible for preserving the chain of evidence, but no receipts or other documentation showing that Carr actually took the photographs to the forensic lab were produced by the SLMPD in response to plaintiff's discovery request for all documents relating to the photographs. Plaintiff asserts there is no evidence other than the testimony of Carr, a convicted felon and admitted perjurer, that he in fact took the photographs to the forensic lab. Plaintiff states that the location where the crack cocaine was purportedly found was highly material in the case brought against him, because the police report falsely stated it was found on the floor of the kitchen after Carr and Sharp saw plaintiff holding it in his hand and attempting to flee the officers, and Carr testified at trial that he photographed the crack in the kitchen and not in the bedroom. Other witnesses, however, testified that plaintiff was seated on a couch in the front room throughout the warrant execution, and that they were told by the officers that the crack cocaine was found in a dresser in the middle bedroom. Plaintiff argues that a dispute of fact exists as to whether Carr destroyed this physical evidence because it contradicted his and Sharp's false version of the events.

Because there is no specific evidence that Carr suppressed the photographs, the inquiry is whether the facts create a reasonable inference that he did. See Reasonover v. St. Louis County, Mo., 447 F.3d 569, 581 (8th Cir. 2006). The Court finds that when the facts are viewed in the light most favorable to plaintiff and all reasonable inferences from the evidence are allowed, including evidence of the criminal conduct Carr confessed to in connection with his official duties, there is a reasonable inference from which a jury could find that Carr deprived plaintiff of a fair trial by deliberately suppressing the photographs–which would have shown that the crack cocaine was found in a bedroom rather than in the kitchen with plaintiff, contrary to Carr's police report and Carr and Sharp's trial testimony–in order to further Carr and Sharp's efforts to cover up their theft of money from 2802 Missouri. Cf. Reasonover, 447 F.3d at 581 (no reasonable inference of unlawful

suppression of a potentially exculpatory audio tape arose from the fact that the name of the police officer and the date of the conversation were on the side of the tape that contained the recording, particularly where the officer denied making the recording or having responsibility for the tape). Whether Carr's alleged failure to preserve the photographs was done in bad faith is a disputed factual issue not appropriate for summary judgment.  Cf. White I, 519 F.3d at 814.

Carr also argues that even if plaintiff could prove he suppressed the photographs, he is entitled to summary judgment based on qualified immunity principles because, while "the Eighth Circuit has suggested that police officers might be liable for the intentional suppression of exculpatory evidence," Carr Mem. Supp. Mot. Summ. J. at 7, such conduct was not clearly actionable under § 1983 at the time of plaintiff's trial in 1998.

"The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences."  White I, 519 F.3d at 813 (citation omitted).  In determining whether an officer is entitled to qualified immunity, courts ask two questions:  (1) "whether, taking the facts in the light most favorable to the injured party, the alleged facts demonstrate that the official's conduct violated a constitutional right"; and (2) whether the asserted constitutional right is clearly established.  Id. A court may address either question first.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).  "If either question is answered in the negative, the public official is entitled to qualified immunity." Norris v. Engles, 494 F.3d 634, 637 (8th Cir. 2007) (quoted case omitted).  "To determine whether a right is clearly established we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  White I, 519 F.3d at 813 (quoted case omitted).

The Eighth Circuit has held that "Brady's protections also extend to actions of other law enforcement officers such as investigating officers," but this can constitute a due process violation

permitting the recovery of § 1983 damages only where the plaintiff alleges the officer had a bad faith intent to deprive him of a fair trial.  White I, 519 F.3d at 814 (quoting Villanova, 368 F.3d at 980).

Subsequently, in White II, the Eighth Circuit upheld a large verdict in favor of the plaintiff on his § 1983 claim against a police officer based on the suppression of exculpatory evidence.  605 F.3d at 528, 532-33.  In White I, the Eighth Circuit rejected the police officer's argument, similar to Carr's, that this right was not clearly established at the time, stating:

> [W]e have held that "the absence of a factually similar case does not guarantee government officials the shield of qualified immunity ....  [t]he key inquiry in deciding whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Moran v. Clark, 359 F.3d 1058, 1060-61 (8th Cir. 2004) (internal citations and quotations omitted).  We hold that no reasonable police officer in Richard's shoes could have believed that he could deliberately misrepresent the nature and length of his relationship with Tina, or that he could deliberately fail to preserve a child victim's diary containing potentially exculpatory information.

White I, 519 F.3d at 814.  The alleged suppression of evidence found actionable in White I occurred in 1998 and 1999, see id. at 810-12, and plaintiff's trial in this case was in 1998.  The right was therefore clearly established.

Accepting the facts as alleged by plaintiff, the Court concludes that no reasonable police officer in Carr's shoes could have believed he could deliberately fail to preserve photographs showing the actual location where the crack cocaine was found, which was potentially exculpatory information.  Whether Carr did so in bad faith is a question for the jury and is not appropriate for summary judgment.  Cf. White I, 519 F.3d at 814.  The Court will therefore deny Carr's motion for summary judgment based on qualified immunity on this aspect of plaintiff's procedural due process claim.

### (b)  Evidence Regarding Sherrod Greenlaw

Although defendant Carr did not move for summary judgment on plaintiff's claim that Carr suppressed potentially exculpatory evidence regarding the arrest of Sherrod Greenlaw, he addressed this claim in his reply memorandum.  Although the Court cannot condone Carr's failure to address this claim in his summary judgment motion, as discussed above with respect to defendant Sharp, plaintiff's deposition testimony shows that plaintiff and his trial counsel obtained from another source information that was related to and more exculpatory to that allegedly suppressed by Carr. As a result, plaintiff cannot show there is a remaining fact issue as to whether a <u>Brady</u> or procedural due process violation occurred based on Carr's alleged suppression of information concerning Greenlaw's arrest.  See <u>Zuazo</u>, 243 F.3d at 431.

Defendant Carr's motion for summary judgment should therefore be granted on plaintiff's procedural due process claim in Count I to the extent it is based on the alleged suppression of exculpatory evidence regarding Sherrod Greenlaw's arrest.  As a result, the Court does not address Carr's argument that he is entitled to qualified immunity on this claim.

### (c)  Evidence of Carr's Corruption

In opposing Carr's motion for summary judgment on the procedural due process claims in Count I, plaintiff argues that Carr suppressed or concealed exculpatory information concerning his own pattern of misconduct which, if disclosed, would have impeached his testimony and credibility, citing <u>Thompson</u>, 722 F.3d 963.  Plaintiff argues he has shown substantial evidence of Carr's corruption, and that his conviction was set aside because evidence of Carr and Sharp's corruption impeached the credibility of their testimony to such an extent it no longer held any probative value.

Carr replies that plaintiff was tried in February 1998 and the record shows Carr had no sustained Internal Affairs Division complaints as of the time of plaintiff's arrest and prosecution,

so there was no evidence of corruption to suppress. Carr asserts that the evidence of corruption plaintiff cites dates from June 2008 and therefore has no bearing on whether Carr withheld impeachment evidence in 1998.

The evidence is that there were two unsustained IAD complaints made against Carr prior to 1998, one of which was comparable to aspects of the instant case because it alleged that Carr seized money during the execution of search warrant but only reported a portion of it and stole the rest. Assuming the existence of a duty to disclose evidence of corruption, the Court concludes such a duty would not extend to unsustained complaints.

The Court concludes Carr has established he is entitled to summary judgment on plaintiff's claim of a procedural due process violation for failure to disclose a pattern of misconduct, as there is no evidence such a pattern existed at the time of plaintiff's trial in February 1998 because Carr had no sustained Internal Affairs complaints at the time. Plaintiff has not shown the existence of a fact issue as to whether there is a reasonable probability that he did not receive a fair trial because of the alleged failure to disclose evidence of Carr's corruption. See Kyles, 514 U.S. at 434.

### b. Substantive Due Process Claims

In paragraphs 53 b) through e) of Count I of the Amended Complaint, plaintiff alleges that defendants Sharp and Carr framed him for a crime he did not commit and obtained his conviction in order to cover up their theft of $5,200 during execution of the search warrant at 2802 Missouri. Plaintiff alleges the defendants planted evidence at the scene, provided false information in the police report, and provided false information to federal prosecutors in order to unconstitutionally deprive plaintiff of his freedom.

A police officer's use of false evidence to secure a conviction violates a defendant's substantive due process rights. White v. Smith, 696 F.3d 740, 754 (8th Cir. 2012) (citing Wilson

v. Lawrence County, 260 F.3d 946, 954 (8th Cir. 2001), and Napue v. Illinois, 360 U.S. 264, 269 (1959)).  The Eighth Circuit has "recognized that a plaintiff can make out a violation of substantive due process by 'offer[ing] evidence of a purposeful police conspiracy to manufacture, and the manufacture of, false evidence.'"  White, 696 F.3d at 754 (quoting Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (en banc)).  Plaintiff's allegations that the defendants manufactured false evidence against him are properly analyzed under the rubric of substantive due process.

"To establish a substantive due process violation, [plaintiff] must demonstrate that a fundamental right was violated and that the conduct shocks the conscience."  Akins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009).  "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).  Whether conduct shocks the conscience is a question of law.  Terrell v. Larson, 396 F.3d 975, 981 (8th Cir. 2005) (en banc).

"In order to 'shock the conscience,' it is not enough that the government official's behavior meets the 'lowest common denominator of customary tort liability.'"  White v. Smith, 696 F.3d at 757 (quoting Lewis, 523 U.S. at 848-49).  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Lewis, 523 U.S. at 849.  "Only the most severe violations of individual rights that result from the 'brutal and inhumane abuse of official power' rise to this level."  White v. Smith, 696 F.3d at 757-58 (quoted case omitted).  Relevant to the allegations in this case, the Eighth Circuit has stated, "There can be little doubt that intentionally manufacturing false evidence to convict a criminal defendant is the sort of 'brutal and inhumane abuse of official power' that shocks the conscience." Id. at 758.

Different standards of culpability can apply to determine whether a defendant's conduct may be considered conscience shocking because "a wide variety of official conduct may cause injury." Folkerts v. City of Waverly, Ia., 707 F.3d 975, 980 (8th Cir. 2013) (quoted case omitted). Where the "state actors have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." Wilson, 260 F.3d at 956 & n.9 (noting that the "reckless standard normally contains a subjective component similar to criminal recklessness."). The Eighth Circuit has also described the recklessness standard as "evinc[ing] deliberate indifference." Scheeler v. City of St. Cloud, Minn., 402 F.3d 826, 831 (8th Cir. 2005). To establish a violation of his substantive due process rights based on the manufacture of false evidence against him, plaintiff must show that Carr and Sharp acted intentionally or recklessly, "thereby shocking the conscience." See Akins, 588 F.3d at 1184.

The Court examines plaintiff's substantive due process claims separately as to each defendant.

### (1) Defendant Sharp

Defendant Sharp moves for summary judgment on plaintiff's substantive due process claims in Count I, asserting that plaintiff "has failed to offer any evidence that Defendant Sharp knowingly used false evidence to secure a conviction," and that the evidence used to convict plaintiff was trial testimony for which he has absolute immunity under Briscoe v. LaHue, 460 U.S. 325, 345 (1983). Sharp Mem. Supp. Mot. Summ. J. at 5. Sharp also asserts that plaintiff has failed to produce any evidence supporting a claim that he fabricated evidence.

Plaintiff responds that the case against him would never have been brought without Carr and Sharp's pretrial actions, including the creation of the false police report, suppression of the photographic evidence, failure to disclose Greenlaw's arrest, failure to disclose the defendants' corrupt practices, and providing false information to the prosecutor. Plaintiff offers the affidavit of

AUSA Stephen Welby, who states that he reviewed Carr's police report and discussed both Carr and Sharp's testimony with them before calling them to testify, relied on that information in prosecuting plaintiff, and would not have prosecuted plaintiff without Carr's report and the information provided in Carr and Sharp's interviews. Plaintiff asserts that testimonial immunity does not apply to investigative conduct by an officer or the officer's conduct as a complaining witness, citing Malley v. Briggs, 475 U.S. 335, 340-41 (1986), and Vakilian v. Shaw, 335 F.3d 509, 516 (6th Cir. 2003).

Sharp replies that the only admissible evidence concerning his alleged fabrication of evidence is that he met with AUSA Welby shortly before trial to discuss his testimony. Sharp asserts that he has absolute immunity for his testimony under Briscoe, and that the absolute immunity extends to any pretrial meetings with prosecutors to discuss his testimony, citing Snelling v. Westhoff, 972 F.2d 199, 200 (8th Cir. 1992), Mowbray v. Cameron County, 274 F.3d 269, 277 (5th Cir. 2001), and Helmig v. Fowler, 2012 WL 3111888, at *2 (W.D. Mo. July 31, 2012).

As a threshold matter, plaintiff attempts to rely on conduct that he alleges violated his procedural due process rights (the alleged suppression of photographs, failure to disclose Greenlaw's arrest, failure to disclose corrupt practices) in arguing that his substantive due process claims should survive summary judgment. The Court will focus on the actions that are alleged to constitute the manufacture of false evidence: preparation of the false police report of plaintiff's arrest and providing false information to the prosecutor that corroborated the false police report. Plaintiff does not allege that Sharp had a role in preparing the police report, so Sharp is entitled to summary judgment on that aspect of plaintiff's claim and the Court examines only Sharp's alleged act of providing false information to the prosecutor.

"[T]he official seeking absolute immunity bears the burden that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991). The Supreme Court has stated

that its recognition of absolute immunity has been "quite sparing" and it has "refused to extend it any 'further than its justification would warrant.'" Id. at 487 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 811 (1982)). Sharp's contention that his pretrial communication to the prosecutor is protected by absolute immunity is not supported by the cases he cites. In Briscoe, the Supreme Court held that witnesses, including police officers, have absolute immunity for testimony in a judicial proceeding, even where the testimony is perjured. 460 U.S. at 331-32. The Supreme Court explained that absolute immunity derived from the common law and was granted to encourage witnesses to testify fully without fear of liability. Id. at 333. Subsequent decisions, including Snelling and Mowbray, extend Briscoe's holding of absolute witness immunity to bar § 1983 claims that allege witnesses entered into a pretrial conspiracy to commit perjury. See Snelling, 972 F.2d at 200; Mowbray, 274 F.3d at 277; Helmig, 2012 WL 3111888, at *2 (citing Snelling and Mowbray; dismissing on the basis of absolute witness immunity § 1983 claim that officer conspired to testify falsely).

Snelling does not control here, because plaintiff does not allege that Sharp conspired with Carr to commit perjury. Rather, plaintiff alleges that Sharp provided false information to the prosecutor as part of the defendants' scheme to frame plaintiff in order to cover up their theft of money from 2802 Missouri during execution of the search warrant. Sharp has not cited any decisions holding that a law enforcement officer has absolute witness immunity where he deliberately provides false information to a prosecutor.

A police officer is entitled only to qualified immunity when acting as a "complaining witness" in a non-adversarial context, as opposed to absolute immunity as a testimonial witness in an adversarial proceeding. See Malley, 475 U.S. 335 (police officer was not entitled to absolute immunity, but rather qualified immunity, in applying for an arrest warrant on the basis of a felony complaint and affidavit he prepared that failed to state probable cause; absolute immunity did not

37

apply because the officer's function in seeking the arrest warrant was similar to that of a complaining witness, and complaining witnesses were not absolutely immune at common law); Odom v. Kaizer, 417 F. App'x 611, 611 (8th Cir. 2011) (unpublished per curiam) (police officer was not entitled to absolute immunity on Fourth Amendment claim he knowingly gave false information while testifying in support of issuance of an arrest warrant; citing Malley); see also Manning v. Miller, 355 F.3d 1028, 1031-33 (7th Cir. 2004) (allegations that FBI agents created and submitted false written reports stating that plaintiff had confessed when they knew he had not, and destroyed or tampered with tapes of the purported confessions, were not "merely a dressed-up claim for conspiracy to commit perjury" and agents were not entitled to absolute immunity); Spurlock v. Satterfield, 167 F.3d 995, 1003-04 (6th Cir. 1999) (deputy sheriff accused of testifying falsely against the plaintiff, fabricating probable cause and coercing an informant to testify falsely was entitled to absolute immunity for his testimony, but not for the alleged non-testimonial acts of fabricating evidence and coercing the informant's false testimony); compare Kalina v. Fletcher, 522 U.S. 118, 129-31 (1997) (prosecutor was not entitled to absolute immunity for making false statements of fact in an affidavit supporting an application for an arrest warrant; in so doing she was performing the function of a complaining witness).[7] Based on these authorities, the Court concludes that Sharp has not established he is entitled to absolute

_____

[7]     In addition, in White I, the plaintiff alleged that the defendant police officer lied to the prosecutor about matters fundamental to the prosecutor's assessment of the relationship between the officer and plaintiff's ex-wife. See White II, 605 F.3d at 532 (discussing White I). The Eighth Circuit found that genuine issues of material fact existed as to whether the officer had deliberately withheld information from the prosecutor and failed to preserve exculpatory evidence, and affirmed the district court's denial of summary judgment on the basis of qualified immunity. See id. There was no discussion of absolute immunity. In White II, the Eighth Circuit found that a reasonable jury could have concluded the officer's misrepresentation to the prosecutors about his relationship with plaintiff's ex-wife and his failure to preserve evidence were done in bad faith, and affirmed the district court's denial of the officer's motion for judgment as a matter of law.

immunity on plaintiff's claim that he provided false evidence to the prosecutor in the pretrial interview.

Sharp also asserts that he is entitled to summary judgment based on qualified immunity because there is no evidence he used false evidence, much less that he knew any knew evidence was false. Sharp also contends plaintiff has not identified any constitutional right that Sharp violated. "At the summary judgment stage, a defendant is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.' Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)." Payne v. Britten, 749 F.3d 697, 708 (8th Cir. 2014) (J. Riley, concurring).

Viewing the facts in the light most favorable to plaintiff, the evidence is that Sharp falsely told the federal prosecutor in a pretrial interview that when Sharp executed the search warrant at 2802 Missouri, he entered the apartment, saw plaintiff holding a bag of crack cocaine, and chased him into the kitchen where plaintiff dropped the bag, when in fact plaintiff had no crack cocaine in his possession and was seated on a couch in the front room of the apartment during the warrant execution. The evidence is also that the prosecutor relied on Sharp's statements in deciding to prosecute plaintiff.

These facts give rise to a reasonable inference that Sharp purposefully or with deliberate indifference manufactured false evidence in order to convict plaintiff and, possibly, to cover up the theft of money from 2802 Missouri. The Eighth Circuit has recognized that a plaintiff can establish a substantive due process violation by offering evidence of the manufacture of false evidence. White v. Smith, 696 F.3d at 754; Moran, 296 F.3d at 647. "There can be little doubt that intentionally manufacturing false evidence to convict a criminal defendant is the sort of 'brutal and inhumane

abuse of official power' that shocks the conscience." White v. Smith, 696 F.3d at 758 (quoting Moran, 296 F.3d at 647). The first prong of the qualified immunity inquiry is therefore met.

"[T]he right to be free from a conviction purposefully obtained by false evidence and false testimony has long been clearly established." Id. at 759 (citing Napue, 360 U.S. at 269, and Mooney v. Holohan, 294 U.S. 103, 112 (1935) (per curiam)). The second prong of the inquiry is also met, and Sharp's motion for summary judgment on plaintiff's substantive due process claim based on providing false evidence to the prosecutor will be denied, including on qualified immunity grounds.

### (2) Defendant Carr

### (a) Substantive Due Process

Defendant Carr moves for summary judgment on plaintiff's substantive due process claims in Count I, that he prepared a false affidavit in support of a search warrant, planted evidence at 2802 Missouri, provided false evidence in a police report and in other documents, and provided false information to federal prosecutors. Carr asserts there is no competent evidence the search warrant affidavit he prepared was false, or that he provided federal prosecutors with any information prior to plaintiff's trial. Carr argues that even assuming plaintiff's allegations are true, he is entitled to summary judgment because any damages plaintiff suffered resulted from Carr's trial testimony and not from any alleged pretrial fabrications plaintiff alleges, citing Briscoe, 460 U.S. at 326 (police officers are entitled to immunity under § 1983 for damages stemming from perjured testimony given at criminal trial). In support of the argument that he is entitled to absolute immunity, Carr asserts that plaintiff's "conviction hinged entirely on eyewitness accounts provided by . . . Carr and Sharp, and such conviction would not have been possible without their testimony," Carr Mem. Supp. Mot. Summ. J. at 9, as no police reports or other documents were shown to the jury or used at plaintiff's

trial, only the drugs and search warrant were admitted into evidence, and the jury was not allowed to see the warrant.[8]

Plaintiff responds that the case against him would never have been brought without Carr's pretrial actions, including creation of the false police report, suppression of the photographic evidence, failure to disclose Greenlaw's arrest, failure to disclose the defendants' corrupt practices, and providing false information to the prosecutor. As previously stated, plaintiff offers the affidavit of former AUSA Stephen Welby, who avers that he reviewed Carr's police report and discussed both Carr and Sharp's testimony with them before calling them to testify, relied on that information in prosecuting plaintiff, and would not have prosecuted plaintiff without Carr's report and the information provided in Carr and Sharp's interviews. Plaintiff asserts that testimonial immunity does not apply to investigative conduct by an officer or the officer's conduct as a complaining witness, citing Malley, 475 U.S. at 340-41, and Vakilian, 335 F.3d at 516.

Carr replies that plaintiff's damages result from the defendants' trial testimony, not any alleged pretrial fabrications, and that plaintiff does not dispute his assertions concerning the evidence admitted at trial. Carr reiterates his position that he is entitled to summary judgment based on absolute testimonial immunity under Briscoe and Rehberg v. Paulk, 132 S. Ct. 1497 (2012) (extending immunity under § 1983 to witnesses in a grand jury proceeding). Carr also offers a new argument in his reply memorandum, as follows: Because the allegedly fabricated evidence was not shown to the jury at trial, plaintiff cannot establish that the fabrication caused his conviction and his claims must be dismissed. In support, Carr cites Myers v. Bull, 599 F.2d 863, 866 (8th Cir. 1979)

---

[8]Carr does not assert that he is entitled to qualified immunity on plaintiff's substantive due process claims.

("Absent some showing that the alleged perjurious deposition had some causal relationship to appellant's conviction, he has failed to state a claim upon which relief can be granted.").

As with defendant Sharp, the Court limits its analysis to the actions alleged to violate plaintiff's substantive due process rights: Carr's alleged creation of a false police report and providing false information to the federal prosecutor in support of the false police report.[9] As stated previously, "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns, 500 U.S. at 486. Carr does not cite any factually similar cases to support his contention that he is entitled to absolute immunity in connection with preparing the false police report and providing false information to the federal prosecutor. Carr is entitled only to qualified immunity when acting as a "complaining witness" in a non-adversarial context, as opposed to absolute immunity as a testimonial witness in an adversarial proceeding. See Malley, 475 U.S. 335; Odom, 417 F. App'x at 611; see also White I, 519 F.3d at 813-14; Manning, 355 F.3d at 1031-33; Spurlock, 167 F.3d at 1003-04; compare Kalina, 522 U.S. at 129-31. Based on these authorities, the Court concludes Carr has not established that he is entitled to absolute immunity on plaintiff's claims she created a false police report and provided false evidence to the prosecutor.

To the extent it is appropriate to address Carr's belated argument, raised for the first time in his reply brief, that he is entitled to summary judgment because the allegedly false police report was not shown to the jury, the Court concludes the motion should be denied. Here, plaintiff offers evidence of a causal relationship between the allegedly perjured evidence and plaintiff's conviction: the prosecutor's affidavit stating that he reviewed Carr's police report, discussed Carr's testimony

---

[9]    The Court will discuss separately plaintiff's claim that Carr included false information in the warrant application, as this invokes his Fourth and Fourteenth Amendment rights rather than substantive due process.

with him before calling him to testify, relied on the content of the police report and the officers' pretrial statements in prosecuting plaintiff, and would not have prosecuted plaintiff without the police report and information provided in the pretrial statements. As a result, the Myers case on which Carr relies is factually distinguishable. Carr's motion for summary judgment on plaintiff's substantive due process claims based on the manufacture of false evidence should therefore be denied.

(b) False Affidavit in Support of Search Warrant

Plaintiff also alleges in paragraph 53.a) of Count I that the defendants prepared a false affidavit to obtain the search warrant for 2802 Missouri. Carr moves for summary judgment asserting that plaintiff lacks any evidence that the search warrant affidavit was false. Carr discusses this aspect of Count I in the portion of his summary judgment memorandum addressing the fabrication of evidence, i.e., the substantive due process claims.

The Supreme Court has instructed that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) (internal punctuation marks, quotation marks and quoted case omitted). Plaintiff's allegation that Carr submitted a false affidavit to obtain a search warrant in the absence of probable cause invokes plaintiff's rights under the Fourth and Fourteenth Amendments rather than the Due Process Clause. See Franks v. Delaware, 438 U.S. 154, 171-72 (1978); Livers, 700 F.3d at 357.

Plaintiff's summary judgment opposition states that he does not bring claims for malicious prosecution or false arrest under § 1983. Pl.'s Mem. Opp at 5. Plaintiff's opposition to the defendants' motions for summary judgment on his substantive due process claims does not mention a claim based on the filing of a false affidavit in support of the search warrant. Id. at 10-12. The

Court therefore concludes plaintiff has abandoned any claim concerning a false affidavit. Carr's motion for summary judgment should therefore be granted to the extent it is based on the alleged filing of a false affidavit in support of the search warrant, and summary judgment should also be granted as to defendant Sharp on the same basis. In addition, there is no evidence in the record to show that Sharp had any involvement in preparation of the affidavit.

B. Count II - Conspiracy in Violation of § 1983

In Count II, plaintiff alleges that defendants Carr and Sharp conspired and acted together to frame him for a crime he did not commit, by engaging in multiple overt acts. Both Carr and Sharp move for summary judgment on the § 1983 conspiracy claim on the sole basis that plaintiff has failed to establish an underlying constitutional tort claim, citing Gordon v. Hansen, 168 F.3d 1109, 1115 (8th Cir. 1999).

To prevail on a claim of § 1983 conspiracy, a plaintiff must show "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." White I, 519 F.3d at 814 (internal citations omitted). The defendants are correct that a claim of civil conspiracy is not an independent cause of action, and can only be sustained after an underlying tort claim has been established. See Hanten v. School Dist. of Riverview Gardens, 183 F.3d 799, 809 (8th Cir. 1999)

Because the Court has concluded that defendants' motions for summary judgment should be denied in part on plaintiff's procedural and substantive due process claims, their motions for summary judgment on the conspiracy claim should be denied as well.

C. <u>State Law Claims</u>

Plaintiff's Amended Complaint asserts supplemental state law claims against defendants Carr and Sharp for malicious prosecution (Count V), false imprisonment (Count VI), and abuse of process (Count VII).  The defendants separately move for summary judgment on each count.  Where appropriate, the Court will address the defendants' arguments separately.

*i. Official Immunity - Defendant Sharp*

Defendant Sharp asserts that he is entitled to official immunity on plaintiff's state law tort claims because his actions in investigating and arresting plaintiff were discretionary, and there is no evidence he committed a willful or malicious wrong related to the investigation or arrest.  Plaintiff responds that Sharp is not entitled to official immunity because a reasonable juror could find that Sharp's actions with Carr to frame plaintiff for a crime he did not commit were undertaken in bad faith and with malice.

"Under Missouri law, the official immunity doctrine protects public officials from liability for injuries arising out of their discretionary acts or omissions, but not from liability in claims arising from their performance of ministerial acts."  Reasonover, 447 F.3d at 585 (cited case omitted).  "The investigation of a crime is a discretionary act, not a ministerial one."  Id.  Official immunity does not apply, however, to discretionary acts done in bad faith or with malice.  Id.; State ex rel. Twiehaus v. Adolf, 706 S.W.2d 443, 446 (Mo. 1986) (en banc).  "The relevant definition of bad faith or malice in this context ordinarily contains a requirement of actual intent to cause injury."  Twiehaus, 706 S.W.2d at 447.  "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.  An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others."  Id. (internal punctuation and

quoted case omitted). "Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." Id. (brackets and quoted case omitted). An allegation of "malicious motive or purpose or of conscious wrongdoing" is sufficient under Missouri law to preclude application of the official immunity doctrine. See Twiehaus, 706 S.W.2d at 447.

In this case, plaintiff alleges that defendant Sharp committed intentional torts – malicious prosecution, false imprisonment and abuse of process – based on his actions in executing the search warrant at 2802 Missouri, arresting plaintiff, providing false information to the prosecutor, and testifying falsely at plaintiff's trial. These allegations describe a conscious abuse of official duty and power which fall within the scope of malice or bad faith. Under these circumstances, whether official immunity applies is a question of fact which must be considered by the jury. See Blue v. Harrah's North Kansas City, LLC, 170 S.W.3d 466, 479-80 (Mo. Ct. App. 2005) (summary judgment inappropriate where facts created a genuine dispute about whether officer acted in bad faith or with malice in making arrest, thereby precluding him from claiming official immunity, and issue was for jury). Defendant Sharp's motion for summary judgment on plaintiff's state law tort claims on the basis of official immunity should therefore be denied.

### ii. Witness Immunity - Defendant Carr

In his reply memorandum, defendant Carr raises a new argument that he has absolute witness immunity under state law barring plaintiff from recovering damages on any state law tort claims to the extent the claim depends on Carr's testimony at plaintiff's criminal trial. In support, Carr cites Murphy v. A. A. Mathews, 841 S.W.2d 671, 680 (Mo. 1992) (en banc), and provides only a parenthetical comment, "approving of Briscoe's reasoning." Carr Reply Mem. at 10. It appears

Carr's belated argument was raised in response to a footnote in plaintiff's opposition memorandum which asserted that testimonial immunity under Briscoe is limited to Section 1983 civil rights claims. See Pl.'s Mem. Opp. at 14, n.3. The Court believes it would be appropriate to disregard this new argument because it is entirely conclusory and was raised for the first time in the reply. Out of an abundance of caution, the Court will address the argument and concludes it does not entitle Carr to summary judgment.

The Murphy case was an action against an engineering firm for professional negligence in preparing litigation-related services, to which the engineering firm asserted a defense of witness immunity. In Murphy, the Missouri Supreme Court stated that the doctrine of witness immunity is narrowly applied in Missouri and has been limited to "defamation, defamation-type, or retaliatory cases against adverse witnesses." Id. at 680. After observing that the case before it was "outside the realm of defamation," the Missouri Supreme Court held that witness immunity did not bar the claim for negligent pretrial litigation support services. Id. at 680. The court distinguished Briscoe, noting that it addressed whether § 1983 permits damages to be recovered from a police office for giving allegedly perjured testimony at a defendant's criminal trial. Id. The court stated in dictum, "Clearly, there would be an adverse chilling effect on free testimony, and great disruption to our criminal justice system, if officers were not immune from suits for their testimony." Id. at 680. Presumably, this statement refers to defamation or defamation-type claims against officers, given the Missouri Supreme Court's emphasis in Murphy that witness immunity is narrowly applied.

Murphy is readily distinguishable from the present case on its facts. Carr does not cite any Missouri cases holding that a tort action against a police officer for malicious prosecution, false imprisonment or abuse of process involving trial testimony would be barred by absolute witness immunity. Nor does Carr discuss which of plaintiff's state tort claims are based on his trial

testimony. Carr has not cited any authority to establish that plaintiff's state law claims are in the nature of defamation, and it does not appear that they are. Justice Scalia addressed the distinction between defamation and malicious prosecution in <u>Burns v. Reed</u>, 500 U.S. 478 (1991):

> At common law, all statements made in the course of a court proceeding were absolutely privileged against suits for defamation. Thus, an ordinary witness could not be sued at all; a complaining witness (i.e., the private party bringing the suit) *could be sued for malicious prosecution* but not for defamation. This immunity did not turn upon the claimant's status as a public or judicial officer, for it protected private parties who served as witnesses, and even as prosecuting witnesses. The immunity extended, however, *only against suits for defamation*.

<u>Id.</u> at 501 (Scalia, J., concurring in part and dissenting in part) (internal citations omitted) (emphases added). Justice Scalia also observed, "At common law, the tort of maliciously procuring a search warrant was not a species of defamation (an unintentional tort) but a form of the intentional tort of malicious prosecution." Id. at 504 (citations omitted). <u>See also</u> Restatement (Second) of Torts § 587 (1977), comment a (providing that statements made in the course of a judicial proceeding are absolutely immune in the context of a defamation suit, but not in the context of a suit for malicious prosecution); <u>Houska v. Frederick</u>, 447 S.W.2d 514, 518-19 (Mo. 1969) (while absolute privilege applied to claims of slander of title based on recording of lis pendens, the privilege would not apply to a malicious prosecution claim).

  In addition, as plaintiff observes, the Supreme Court's decision in <u>Briscoe</u> addressed witness immunity under § 1983, not state tort law. <u>Briscoe</u>, 460 U.S. at 330 n.9. Although § 1983 "creates a species of tort liability," <u>Heck v. Humphrey</u>, 512 U.S. 477, 483 (1994) (quoted case omitted), and common law tort rules provide a "starting point for the inquiry under § 1983," <u>Carey v. Piphus</u>, 435 U.S. 247, 258 (1978), the parameters of potential liability under § 1983 for actions taken "under color of law" in violation of "rights, privileges or immunities secured by the Constitution and laws" are governed by the language of the statute as well as its history and purpose. <u>See Heck</u>, 512 U.S. at 492.

Significantly, the Supreme Court remarked in <u>Briscoe</u> that the "states remain free to grant relief" in cases where an innocent plaintiff has obtained post-conviction relief, 460 U.S. at 344 n.30, even though the Court held there was absolute immunity for damages under § 1983.

In sum, Carr's conclusory citation to <u>Murphy</u>, unsupported by argument, does not establish that he is entitled to summary judgment based on absolute immunity from plaintiff's state law tort claims to the extent those claims are based on his trial testimony.

### iii. Malicious Prosecution

Defendants Carr and Sharp separately move for summary judgment on plaintiff's malicious prosecution claim in Count V. Each defendant asserts there is no evidence that he "instigated" plaintiff's prosecution, a necessary element of malicious prosecution. Plaintiff responds that the purported evidence against him was summarized in the police report prepared by Carr, which was reviewed by the prosecutor, and the prosecutor avers he interviewed both Carr and Sharp prior to plaintiff's trial and would not have prosecuted plaintiff without the information they provided. Plaintiff also cites Judge Jackson's finding in the Order granting him a Certificate of Innocence that "apart from the now-discredited testimony of Carr and Sharp, there is no evidence that [plaintiff] had possession of cocaine base, either at the time of the search or at any earlier time."

"To establish a prima facie claim for malicious prosecution, a party must plead and prove six elements: (1) commencement of an earlier suit against the party; (2) instigation of that suit by the adverse party; (3) termination of the suit in the party's favor, (4) lack of probable cause for filing the suit; (5) malice by the adverse party in initiating the suit; and (6) damage sustained by the party as a result of the suit. <u>Edwards v. Gerstein</u>, 237 S.W.3d 580, 582-83 (Mo. banc 2007)." <u>State ex rel. O'Basuyi v. Vincent</u>, 434 S.W.3d 517, 519 (Mo. 2014) (en banc) (original emphasis deleted). Defendants challenge only the second element, instigation.

"Instigation requires that there be some affirmative action by way of encouragement, advice, pressure, or the like in the institution of the prosecution." Crow v. Crawford & Co., 259 S.W.3d 104, 115 (Mo. Ct. App. 2008). Under Missouri law, to instigate also means "to stimulate or goad to an action, especially a bad action." Snider v. Wimberly, 209 S.W.2d 239, 242 (Mo. 1948) (quoted case omitted). Simply triggering an investigation is insufficient to establish that a defendant instigated the prosecution. Zike v. Advance Am., 2010 WL 1816747, at *7 (E.D. Mo. May 3, 2010).

"Where . . . an informant knowingly gives false or misleading information or directs or counsels officials in such a way as to actively persuade and induce the decision to prosecute, the informant may be liable for malicious prosecution." J. D. Lee & Barry A. Lindahl, Modern Tort Law Liability & Litigation § 40:4 (2d ed. 2006). This is the rule in Missouri: "Merely providing honest information from which a prosecution ensues is not instigation, although liability may arise from supplying false information to the prosecuting official." Crow, 259 S.W.3d at 115. The instigation element of malicious prosecution has been described by a leading treatise on tort law as follows:

> The defendant may be liable either for initiating or for continuing a criminal prosecution without probable cause. But the defendant cannot be held responsible unless the defendant takes some active part in instigating or encouraging the prosecution. The defendant is not liable merely because of approval or silent acquiescence in the acts of another, nor for appearing as a witness against the accused, even through the testimony be perjured . . . . On the other hand, if the defendant advises or assists another person to begin the proceeding, ratifies it when it is begun in defendant's behalf, or takes any active part in directing or aiding the conduct of the case, the defendant will be responsible.

Prosser and Keeton on Torts 872 (5th ed. 1984).

Here, when the evidence is viewed in the light most favorable to plaintiff, it tends to show that (1) defendant Carr knowingly prepared a false police report incriminating plaintiff, arrested plaintiff based on the allegations in that report, provided false information to the federal prosecutor, and testified falsely at plaintiff's trial; and (2) defendant Sharp provided false information to the federal

prosecutor and testified falsely at plaintiff's trial. The evidence further tends to show that the prosecutor's decision to prosecute plaintiff was based on the police report prepared by Carr and the pretrial statements made to him by Carr and Sharp, the prosecutor would not have prosecuted plaintiff absent this information, and there was no other evidence against plaintiff. These facts are sufficient to permit a reasonable jury to find that Carr and Sharp each affirmatively encouraged plaintiff's prosecution, and gave false or misleading information in such a way as to actively persuade and induce the prosecutor to prosecute plaintiff. The defendants' motions for summary judgment on plaintiff's malicious prosecution claim should therefore be denied.

### iv. False Imprisonment

Defendants Carr and Sharp separately move for summary judgment on plaintiff's false imprisonment claim in Count VI. Defendant Carr argues there is no evidence that he confined plaintiff without legal justification, as the short detention of plaintiff during and after the search at 2802 Missouri was lawful, and there is no evidence he instigated, caused or procured plaintiff's subsequent arrest and prosecution by federal authorities. Defendant Sharp similarly argues there is no evidence he unlawfully restrained plaintiff, as the evidence is only that plaintiff was detained pursuant to the execution of a search warrant and then for a period of one hour to perform an investigation.[10]

Plaintiff responds that disputed issues of fact exist concerning whether his detention was legally justified, that preclude summary judgment on this claim. Plaintiff argues that it is for the jury

---

[10] In the memoranda in support of their motions for summary judgment, defendants argue that their detention of plaintiff was lawful and support this assertion by providing the citations of various state and federal cases. Defendants do not offer any explanation, however, of the holdings of the cited cases or otherwise explain how the cases support their position and entitle them to judgment as a matter of law. Defendants cannot expect to meet their burden on summary judgment without properly supporting their arguments.

to determine whether the defendants were acting in good faith reliance on a valid search warrant and detained plaintiff because they had reason to believe he was in possession of the crack cocaine, or whether the officers were acting in bad faith and conspiring together to lie in the police report and to prosecutors to frame plaintiff for possession (1) because they could not connect Sherrod Greenlaw, the target of the investigation, to the cocaine, and/or (2) to deflect from the theft of plaintiff's father's money during the warrant execution at 2802 Missouri.

"False imprisonment, also called false arrest, is 'the confinement, without legal justification, by the wrongdoer of the person wronged.' Warrem v. Parrish, 436 S.W.2d 670, 672 (Mo. 1969)." Highfill v. Hale, 186 S.W.3d 277, 280 (Mo. 2006) (en banc). "A person can be liable for false imprisonment if he encourages, causes, promotes, or instigates the arrest." Id. (cited cases omitted). "Whether a person instigated an arrest is a fact-specific inquiry; there is no fixed test that may be applied." Id. (quoted case omitted).

The Court finds that issues of material fact exist which preclude summary judgment on plaintiff's false imprisonment claim, including but not limited to whether defendants Carr and Sharp had legal justification to detain plaintiff when they took him to the police station following execution of the search warrant at 2802 Missouri. Defendants' motions for summary judgment should therefore be denied on Count VI.

*v. Abuse of Process*

In Count VII, plaintiff asserts a claim against defendants Carr and Sharp for the state law tort of abuse of process. Defendants move for summary judgment on the grounds that the claim is barred by the applicable statute of limitations, and that it fails on the merits.

Defendants Carr and Sharp assert that the Missouri five-year statute of limitations for general personal injury claims, § 516.120(2), Mo. Rev. Stat. (2000), applies to abuse of process claims, citing

Corley v. Jacobs, 820 S.W.2d 668, 672 (Mo. Ct. App. 1991).  Defendants assert that the statute begins to run from the termination of the acts that constitute the alleged abuse of process, citing Steinhilber v. Lake Winnebago Home Owner's Association, 965 F.2d 602, 604 (8th Cir. 1992). Defendants argue that the statute of limitations in this case began to run at plaintiff's trial in February 1998 and expired in February 2003, and they are entitled to summary judgment because the claim is time barred.

Plaintiff responds that defendants fail to cite any Missouri case law addressing the statute of limitations for abuse of process in the context of a claim by an exonerated prisoner where the abuse of process resulted in a wrongful conviction.  Plaintiff argues that the statute of limitations does not bar his abuse of process claim for three reasons.  First, plaintiff asserts that the Missouri Supreme Court would adopt the analytical framework of Heck v. Humphrey, 512 U.S. 477, which holds that a claim for damages for an unconstitutional conviction or imprisonment, or for other actions whose unlawfulness would render a conviction or sentence invalid, does not accrue until the conviction or sentence has been reversed on direct appeal or otherwise set aside.  Plaintiff states that his abuse of process claim is premised on the false statements and manufacture of evidence in the police report and search warrant affidavit, the same facts defendants Carr and Sharp testified to at trial that resulted in his conviction.  Plaintiff argues that an abuse of process claim premised on the statements in the police report and warrant affidavit would have impugned his then-existing conviction, and is therefore tolled under Heck's principles.

Second, plaintiff argues that the statute of limitations on this claim did not begin to run until his conviction was set aside, because he would have been collaterally estopped by his conviction from bringing an abuse of process claim during that time period, citing Adams v. VanWormer, 892 S.W.2d 655 (Mo. Ct. App. 1994) (convicted murderer was collaterally estopped from claiming in

civil lawsuit against police officer and witness involved in criminal trial that these witnesses lied or suborned perjury to wrongly convict him).

Third, plaintiff argues that abuse of process can constitute a "continuing tort" or "continuing wrong" under Missouri law, citing Davis v. Laclede Gas Co., 603 S.W.2d 554, 556 (Mo. 1980) (en banc) ("If . . . the wrong may be said to continue from day to day, and to create a fresh injury from day to day, and the wrong is capable of being terminated, a right of action exists for the damages suffered within the statutory period immediately preceding suit."); and Guirl v. Guirl, 708 S.W.2d 239, 247 (Mo. Ct. App. 1986) (filing and *maintaining* a petition constituted abuses of process).

Finally, plaintiff argues that Sharp and Carr raised these same legal arguments in their motions to dismiss, which were denied, and have not raised any new legal or factual grounds to revisit that decision on summary judgment.

Defendant Carr replies that the claim is time barred because there is no requirement that a plaintiff asserting a claim for abuse of process must be vindicated in the underlying action prior to bringing his claim, citing Moffett v Commerce Trust Co., 283 S.W.2d 591, 599 (Mo. 1955). Defendant Sharp replies that statutes of limitation are favored under Missouri law and plaintiff bears the burden of showing he strictly comes with a claimed exception, citing Graham v. McGrath, 243 S.W.3d 459, 464 (Mo. Ct. App. 2007). Sharp states that while Missouri recognizes a "litigation exception" which tolls a statute of limitations "where a person is prevented from exercising his legal remedy by the pendency of legal proceedings," citing Knipmeyer v. Spirtas, 750 S.W.2d 489, 490 (Mo. Ct. App. 1988), the exception only applies where a party was "legally prevented from bringing the suit, State ex rel. Mahn v. J.H. Berra Construction Co., Inc., 255 S.W.3d 543, 547 (Mo. Ct. App. 2008), and plaintiff was not "legally prevented" from bringing this claim by the pendency of legal proceedings.

As an initial matter, plaintiff's argument that the Court should deny defendants' motion for summary judgment because it previously denied defendants' motions to dismiss on statute of limitations grounds fails to recognize the different standards applied to motions to dismiss and for summary judgment. In the context of a motion to dismiss under Rule 12(b)(6), dismissal on the basis of the statute of limitations is proper only where the complaint itself establishes the defense. See Joyce v. Armstrong Teasdale, LLP, 635 F.3d 364, 367 (8th Cir. 2011). The complaint itself did not establish the defense and therefore the motions to dismiss were denied. See Mem. and Order of Nov. 7, 2013 at 14 (Doc. 96). On summary judgment, the Court must determine whether there are any genuine issues of material fact that preclude summary judgment and whether the defendants have established they are entitled to judgment on the claim as a matter of law. See Celotex, 477 U.S. at 322.

A plaintiff must prove three elements to succeed on a claim for abuse of process under Missouri law: "(1) the present defendant made an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process; (2) the defendant had an improper purpose in exercising such illegal, perverted or improper use of process; and (3) damage resulted." Stafford v. Muster, 582 S.W.2d 670, 678 (Mo. 1979) (en banc). In contrast to a malicious prosecution claim, a prior favorable termination is not an element of an abuse of process claim. Moffett, 283 S.W.2d at 599 ("The purpose for which the process is used, once it is issued, is the only thing of importance. Consequently in an action for abuse of process it is unnecessary for the plaintiff to prove that the proceeding has terminated in his favor, or that it was obtained without probable cause or in the course of a proceeding begun without probable cause.") (quoted source omitted).

Because this is a state law claim, the Court applies Missouri law regarding the statute of limitations and any rules that are an integral part of the statute of limitations, such as tolling and

equitable estoppel.  See Walker v. Barrett, 650 F.3d 1198, 1203-04 (8th Cir. 2011).  The Missouri

five-year statute of limitations applies to a claim for abuse of process.  See Corley, 820 S.W.2d at

672.  The statute of limitations on an abuse of process claim under Missouri law begins to run "from

the termination of the acts which constitute the abuse complained of, and not from the completion

of the action in which the process issued."  Id. (citation omitted).  "The cause of action for an abuse

of process is complete as soon as the acts complained of are committed."  Id. (quoting 72 C.J.S.

Process § 112 (1987)).  Barring any exceptions or tolling provision, plaintiff's abuse of process claim

from events that occurred in 1997 and 1998 are barred by the five-year statute of limitations.

To determine whether tolling principles apply to save the abuse of process claims, the Court

must first predict whether the Missouri Supreme Court would apply the Heck accrual rule to abuse

of process claims, an issue that court has not addressed.  See Blankenship v. USA Truck, Inc., 601

F.3d 852, 856 (8th Cir. 2010) (recognizing that federal courts make an "Erie-educated guess" when

a state supreme court has not addressed an issue).[11]

The Supreme Court in Heck, 512 U.S. at 484, held that favorable termination was an essential

element of a § 1983 claim based on allegations police officers engaged in an unreasonable

investigation leading to the plaintiff's arrest, knowingly destroyed exculpatory evidence, and caused

an illegal voice identification procedure to be used at trial.  The Court concluded the § 1983 claims

were most analogous to the common law tort of malicious prosecution.  The Supreme Court noted

the principle that "to permit a convicted criminal defendant to proceed with a malicious prosecution

claim would permit a collateral attack on the conviction through the vehicle of a civil suit," id. at 484

(quoted source omitted), and held this principle precluded a § 1983 claim that necessarily required

---

[11]  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) (holding a federal court sitting in diversity
is bound by the decisions of the state's highest court).

the plaintiff to prove the unlawfulness of his conviction or confinement.  Id. at 484, 487.  The Court

also held that a cause of action under § 1983 "for damages attributable to an unconstitutional

conviction or sentence does not accrue until the conviction or sentence has been invalidated."  Id. at

489.

The Heck accrual rule was clarified and limited in Wallace v. Kato, 549 U.S. 384 (2007), in

which the Supreme Court held that the statute of limitations for a § 1983 claim for unlawful arrest

in violation of the Fourth Amendment began to run when the arrestee appeared before an examining

magistrate and was bound over for trial, not later when charges were dropped.  Id. at 390.  The

Supreme Court looked to the federal common law of false imprisonment as the most analogous cause

of action, and held that the claim could not accrue until the tort of false imprisonment ended.  Id. at

388.  The Court then turned to the question of when false imprisonment ends and determined that it

ends when the person becomes held pursuant to legal process:

> Reflective of the fact that false imprisonment consists of detention without legal
> process, a false imprisonment ends once the victim becomes held *pursuant to such
> process*—when, for example, he is bound over by a magistrate or arraigned on
> charges.  Thereafter, unlawful detention forms part of the damages for the "entirely
> distinct" tort of malicious prosecution, which remedies detention accompanied, not
> by absence of legal process, but by *wrongful institution* of legal process.  "If there is
> a false arrest claim, damages for that claim cover the time of detention up until
> issuance of process or arraignment, but not more.  From that point on, any damages
> recoverable must be based on a malicious prosecution claim and on the wrongful use
> of judicial process rather than detention itself."  Thus, petitioner's contention that his
> false imprisonment ended upon his release from custody, after the State dropped the
> charges against him, must be rejected.  It ended much earlier, when the legal process
> was initiated against him, and the statute would have begun to run from that date[.]

Wallace, 549 U.S. at 389-90 (internal citations omitted).

In Wallace, the Supreme Court declined to apply the Heck rule for deferred accrual, which

applies only where there is an outstanding criminal judgment and "delays what would otherwise be

the accrual date of a tort action until the setting aside *of an extant conviction* which success in that

tort action would impugn." Id. at 393. The Supreme Court distinguished Wallace from Heck on the basis that the claim in Heck was analogous to the tort of malicious prosecution, rather than false imprisonment. Id. at 393-94. The Court stated that while a claim of malicious prosecution would inevitably impugn the validity of a conviction, a claim of false imprisonment only impugns an *anticipated* future conviction because the claim ends well before the conviction occurs. Id. at 394.

The Seventh Circuit has characterized Wallace as holding "a claim that accrues before a criminal conviction may and usually must be filed without regard to the conviction's validity." Evans v. Poskon, 603 F.3d 362, 363 (7th Cir. 2010). This interpretation of Wallace's holding focuses "on the factual distinction between Heck and Wallace: the tort of false arrest is complete, and therefore begins to accrue, once the individual is brought before a magistrate; the tort of malicious prosecution is not complete until a conviction occurs and that conviction has been overturned, and therefore the statute of limitations for malicious prosecution does not begin to accrue until that time." Parish v. City of Elkhart, 614 F.3d 677, 681-82 (7th Cir. 2010).

As with the unlawful arrest claim in Wallace, plaintiff's claims for abuse of process under Missouri law were complete and accrued immediately upon the termination of the acts constituting the improper use of process, see Corley, 820 S.W.2d at 672, well prior to plaintiff's criminal conviction. In contrast to the facts in Heck, plaintiff did not have to show that the prior criminal proceedings terminated in his favor before he could bring an abuse of process claim. See Moffatt, 283 S.W.2d at 599. Plaintiff could have brought suit on his abuse of process claim immediately after the acts he complains of occurred, and for these reasons the Court concludes the claim is time barred.[12] Cf. Dickerson v. City of Hickman, 2010 WL 816684, at *5 (W.D. Ky. Mar. 4, 2010) (one-

---

[12] The Court questions whether defendant Carr's preparation of an allegedly false police report or the defendants' allegedly false trial testimony can be considered "process" in the context of an

year Kentucky statute of limitations for abuse of process claims accrued from the termination of the acts which constituted the abuse complained of, and the claims were time barred). For these reasons, the Court concludes that the Missouri Supreme Court would not apply the <u>Heck</u> accrual rule to Missouri abuse of process claims.[13]

Addressing plaintiff's second argument, Missouri courts have held that certain types of claims are collaterally estopped by a criminal conviction, <u>see</u>, <u>e.g.</u>, <u>VanWormer</u>, 892 S.W.2d at 657 (criminal conviction collaterally estopped the defendant from claiming he was not guilty and that witnesses lied in the criminal proceeding to wrongly convict him); <u>Johnson v. Raban</u>, 702 S.W.2d 134, 138 (Mo. Ct. App. 1985) (denial of relief in postconviction proceeding collaterally estopped defendant from relitigating his counsel's negligence in a legal malpractice action). The Court concludes, however, that plaintiff's criminal conviction would not have collaterally estopped him from bringing the abuse of process claim for the same reasons the claim would not have been barred by the <u>Heck</u> accrual rule: under Missouri law, the claim accrued when the acts alleged to be abuse of process were completed, and plaintiff was not required to show favorable termination of the criminal proceedings against him to establish an abuse of process claim.

Finally, because the statute of limitations on an abuse of process claim "begins to run from the termination of the acts which constitute the abuse complained of, and not from the completion of the action in which the process issued," <u>Corley</u>, 820 S.W.2d at 672, the Court concludes the Missouri continuing tort or continuing wrong doctrine does not apply to an abuse of process claim.

───────────────

abuse of process claim. This need not be addressed, however, as all of the actions plaintiff claims as abuse of process were completed in 1997 or 1998, more than five years before this action was filed.

[13]     In so concluding, the Court does not intend to offer any comment as to whether the Missouri Supreme Court might adopt the <u>Heck</u> accrual rule for any other type of claim.

For these reasons, the Court concludes that defendants' motions for summary judgment should be granted on plaintiff's abuse of process claims in Count VII, which are barred by the statute of limitations.  As a result, the Court does not reach the defendants' arguments concerning the merits of the abuse of process claims.

## V.  Conclusion

For the foregoing reasons, the Court concludes that defendants Carr and Sharp's motions for summary judgment should be granted in part, denied in part, and denied in part as moot, as set forth below.

In summary, plaintiff's claims remaining for trial against defendant Carr are the: (1) procedural due process claim in Count I based on Carr's alleged suppression of photographs showing where the crack cocaine was found; (2) substantive due process claims in Count I based on the alleged manufacture of false evidence (creating a false police report and providing false information to the prosecutor); (3) § 1983 conspiracy claim in Count II; (4) state law malicious prosecution claim in Count V; and (5) state law false imprisonment claim in Count VI.

Plaintiff's claims remaining for trial against defendant Sharp are the: (1) substantive due process claim in Count I based on the alleged manufacture of evidence (providing false evidence to the prosecutor); (2) § 1983 conspiracy claim in Count II; (3) state law malicious prosecution claim in Count V; and (4) state law false imprisonment claim in Count VI.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Carr's Motion for Summary Judgment is **GRANTED in part**, **DENIED in part**, and **DENIED in part as moot**:  [Doc. 196]

The motion is **GRANTED** as to the Fifth Amendment claims in Count I; procedural due process claims in Count I based on the alleged suppression of evidence of Sherrod Greenlaw's arrest

and Carr's corruption; Fourth and Fourteenth Amendment claims in Count I based on submitting a false affidavit in support of the search warrant; and abuse of process claim in Count VII;

The motion is **DENIED** as to the procedural due process claims in Count I based on Carr's alleged suppression of photographs showing where the crack cocaine was found, including on the basis of qualified immunity; substantive due process claims in Count I based on the manufacture of false evidence (creating false police report and providing false information to the prosecutor); § 1983 conspiracy claims in Count II; state law malicious prosecution claim in Count V; and state law false imprisonment claim in Count VI; and

The motion is **DENIED as moot** as to claims of § 1983 malicious prosecution and false arrest in Count I because plaintiff has stated he does not assert such claims.

**IT IS FURTHER ORDERED** that defendant Sharp's Motion for Summary Judgment is **GRANTED in part**, **DENIED in part**, and **DENIED in part as moot**: [Doc. 193]

The motion is **GRANTED** as to the Fifth Amendment claims in Count I, procedural due process claims in Count I; substantive due process claims in Count I based on creation of a false police report; Fourth and Fourteenth Amendment claims in Count I based on submitting a false affidavit in support of the search warrant; and state law abuse of process claims in Count VII;

The motion is **DENIED** as to the substantive due process claims in Count I based on providing false evidence to the federal prosecutor, including on the basis of qualified immunity; § 1983 conspiracy claims in Count II; state law malicious prosecution claim in Count V; and state law false imprisonment claim in Count VI; and

The motion is **DENIED as moot** as to claims of § 1983 malicious prosecution and false arrest in Count I because plaintiff has stated he does not assert such claims.

An appropriate partial judgment will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  18th  day of November, 2014.